[No. D033482. Fourth Dist., Div. One. July 11, 2001.]

In re the Marriage of CAROL C. and WILLIAM H. DUNCAN, JR.
CAROL C. DUNCAN, Appellant, v.
WILLIAM H. DUNCAN, JR., Appellant.

618

**COUNSEL**

Law Offices of Marjorie G. Fuller, Marjorie G. Fuller; Seltzer Caplan Wilkins & McMahon, Gerald L. McMahon and Lee E. Hejmanowski for Appellant Carol C. Duncan.

Lorenz, Alhadeff, Cannon & Rose, Cannon, Parks & Oberhansley, Robert J. Parks, Jerry M. Cannon, Marjeta D. Six; Law Offices of Stephen Temko and Stephen Temko for Appellant William H. Duncan, Jr.

## OPINION

**KREMER, P. J.**—Carol C. and William H. Duncan, Jr., were married in February 1989 and separated in September 1994. During their marriage, Carol and William acquired the majority of shares in Duncan-Hurst Capital Management, Inc. (Duncan-Hurst), an investment advisory business managed and operated by William. In a bifurcated proceeding, the court found Duncan-Hurst was community property and applied the exception of Family Code[1] section 2552, subdivision (b) to value the business as of the date of separation. Carol appeals this order, contending the court should have valued Duncan-Hurst as of the date of trial, using an apportionment formula. Carol further contends the court erred in denying her request for attorney fees under section 2030. William also appeals, contending the court used an incorrect method of calculating the value of Duncan-Hurst. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Before his marriage to Carol, William built a national reputation as a professional investment adviser over a 20-year period, managing pension plan monies for various companies. These companies, called plan sponsors, hire pension consultants to help them hire the right investment adviser. The main hiring criterion the pension consultant uses is the investment adviser's "track record," meaning history of investment returns over time. Investment advisers are chosen based on the strength of their track records compared to the track records of other similar advisers. To be successful, investment advisers must outperform their peers regardless of the performance of the stock market. Plan sponsors have a fiduciary duty to select the top performing investment advisers.

Once a pension consultant identifies the best three to five advisers, the advisers are interviewed, with one or two of them qualifying for a final interview. When an adviser is selected, the plan sponsor transfers control of investing certain pension monies to the adviser. Plan sponsors and pension consultants continue to monitor the adviser's investment performance by comparing it to other similar advisers with the same investment style to determine whether to continue his or her investment services. If plan sponsors are dissatisfied with the investment performance of their investment adviser, they can withdraw their funds.

In 1990 William and Carol formed Duncan Capital Management to manage pension funds for large corporations and institutions. Within five

---

[1] All statutory references are to the Family Code unless otherwise specified.

months, the company was managing $84 million in pension funds. The funds were invested in stocks in companies defined as small-cap, mid-cap and large-cap, depending on their market capitalization. Frank Hurst, a marketing specialist, joined the business in exchange for 21 percent of the stock.[2] The company then became known as Duncan-Hurst, with William serving as chairman, chief executive officer, chief investment officer, and portfolio manager of the small-cap and mid-cap funds. William maintained complete control of the management and operation of the company and was the sole member of the board of directors. Hurst was manager of marketing and client services, as well as president and chief administrative officer.

William was solely responsible for all investment decisions for at least 97 percent of assets under management. As small-cap and mid-cap portfolio manager, William actively managed about 200 stocks daily. In so doing, he made all buy, sell and hold decisions and signed every trade ticket. David Magee and Stephen McNally managed the remaining 3 percent of Duncan-Hurst's assets, comprised of the large-cap portfolio, the hedge fund and an offshore mutual fund. William assisted in managing these funds. He initiated the company's investment strategies and policies in 1990 and supervised their ongoing application. William was also primarily responsible for approving all professional hiring decisions and employee compensation.

Carol and William had two children, born in 1989 and 1991. Carol devoted the majority of her time and effort to the home and children while William continued to run the business.

By September 1994 Duncan-Hurst had 19 employees, including investment analysts, traders and marketing specialists. The company was managing $1.086 billion in assets. William's annual income was $5.8 million.

After Carol and William separated in September 1994, William continued to operate Duncan-Hurst. The value of the company continued to increase, with assets under management totaling $2.628 billion by August 1996.

In April 1997 the court heard issues of property division and support in four phases. In the first phase, the court found Duncan-Hurst was community property and selected the date of separation as an alternative valuation date under section 2552, subdivision (b). Specifically, the court found William was the "key" to Duncan-Hurst's success and the company's value increased after the parties separated as a result of William's reputation, investing skill

---

[2]Carol and William owned 78 percent of Duncan-Hurst's stock. Rebecca LaFerney, vice-president of administration and manager of operations, owned 1 percent of the stock.

and guidance. In the second phase, the court valued the company at $25.5 million,[3] using the standard appraisal technique of comparable sales.

In the third phase, the court determined the terms of William's obligation to pay Carol one-half the value of the community interest in Duncan-Hurst, spousal and child support, and life insurance. The court awarded Carol $25,772 per month in child support, plus retroactive child and spousal support of $660,000.[4] Carol received $9,634,006 to equalize the property division, $4 million of which was to be paid in cash, and the balance, including interest, to be paid monthly under a secured promissory note. In the fourth phase, the court denied Carol's request for attorney fees based on need and ability to pay (§ 2030). The court entered judgment on all findings and orders.

DISCUSSION

*Carol's Appeal*

I

*Date of Valuation*

Carol contends the court prejudicially erred by applying the exception of section 2552, subdivision (b) to value Duncan-Hurst as of the date of separation rather than the date of trial. She asserts the significant increase in Duncan-Hurst's value after the parties separated resulted from factors other than William's personal efforts. Thus, she claims, an alternative valuation date was legally impermissible.

A

When a spouse operates a community property business after separation, there is an inherent tension between the general rule that the business must be valued as of the date of trial (former Civ. Code, § 4800, subd. (a), now Fam. Code, § 2552, subd. (a)) and the rule that a spouse's earnings after separation are his or her separate property. (Former Civ. Code, § 5118, now Fam. Code, § 771, subd. (a); see *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 20 [261 Cal.Rptr. 294].) Before 1976, the only method a court had to ameliorate the effects of a trial date valuation was to equitably apportion a spouse's postseparation efforts between community and separate

---

[3]Based on the parties' 78 percent ownership of Duncan-Hurst, the court calculated the community interest to be $19.8 million.

[4]Spousal support was terminated after three and one-half years, as of September 1, 1998.

interests. (*In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 436 [119 Cal.Rptr. 590].) However, in 1976, the Legislature amended former Civil Code section 4800, subdivision (a) (now Fam. Code, § 2552) to provide: "[T]he court shall value the assets and liabilities as near as practicable to the time of trial, except that, upon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and prior to trial to accomplish an equal division of the community property and the quasi-community property of the parties in an equitable manner." ■ The amendment was designed to remedy certain inequities such as "when the hard work and actions of one spouse *alone* and after separation . . . greatly increases the 'community' estate which must then be divided with the other spouse." (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 423 [149 Cal.Rptr. 616].) In this regard, Family Code section 2552, subdivision (b) gives the trial court considerable discretion to divide community property in order to assure an equitable settlement is reached. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 603 [153 Cal.Rptr. 423, 591 P.2d 911].)

■ Where, as here, the trial court is vested with discretionary powers, we review its ruling for an abuse of discretion. (*In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1435 [28 Cal.Rptr.2d 726].) As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480 [274 Cal.Rptr. 911].) ■ Further, because the reasons for change in value of an asset are ordinarily factual, our role is limited to determining whether there is sufficient evidence to conclude the trial court's decision was within the permissible range of options set by the legal criteria. (*Dorman v. DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815 [42 Cal.Rptr.2d 459].)[5]

■ Case law has established that good cause generally exists for a professional practice to be valued as of the date of separation. (*In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1524 [284 Cal.Rptr. 201] [valuation of law practice]; *In re Marriage of Green, supra,* 213 Cal.App.3d at p. 20 [valuation of law practice].) This exception to trial date valuation applies because the value of such businesses, "including goodwill, is primarily a reflection of the practitioner's services (accounts receivable and work in progress) and not capital assets such as desks, chairs, law books

---

[5]Carol urges us to apply an independent review standard, arguing the court's ruling involved interpreting section 2552, subdivision (b) as applied to undisputed facts. However, in determining whether good cause existed to apply the exception of section 2552, subdivision (b), the court considered conflicting evidence as to whether William's personal skill, reputation and guidance were largely responsible for Duncan-Hurst's increased value. Because the facts were disputed, the proper standard of review is abuse of discretion.

and computers. Because earnings and accumulations following separation are the spouse's separate property, it follows the community interest should be valued as of the date of separation—the cutoff date for the acquisition of community assets." (*In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250, 253-254 [24 Cal.Rptr.2d 411].)

Moreover, "[t]he rationale for the general exception to trial date valuation is not limited to small law practices. It applies with equal logic to other small businesses which rely on the skill and reputation of the spouse who operates them." (*In re Marriage of Stevenson, supra,* 20 Cal.App.4th at p. 254 [small general contracting business falls within general *exception* to trial date valuation].) Thus, an alternative valuation date may apply to a business when its value "devolves largely from the personal skill, industry and guidance of the operating spouse," rather than the business's capital assets. (*Ibid.*; see also *In re Marriage of King* (1983) 150 Cal.App.3d 304, 310 [197 Cal.Rptr. 716] [husband's postseparation efforts, earnings and accumulations from technical consulting business were his separate property]; *Bing v. Bing* (1959) 168 Cal.App.2d 348, 350 [335 P.2d 1020] [value of husband's general contracting business dependent on his personal skill and industry].) Conversely, a trial date valuation may be appropriate where the postseparation efforts of the operating spouse have "minimal impact" on any increase in the value of the business. (*In re Marriage of Green, supra,* 213 Cal.App.3d at p. 21.)

### B

Here, the evidence showed Duncan-Hurst has all the attributes of a professional practice, including (1) performing services for a fee, (2) offering specialized knowledge and experience, (3) being licensed and regulated and (4) having assets that consist largely of office equipment, accounts receivable and work in progress. Duncan-Hurst's value and success depend almost exclusively on William's skill, industry, guidance and reputation. Jeffrey Lovell, a leading expert in the investment management industry, testified the entire value of Duncan-Hurst derives from William's skill and exceptional track record, and the company's success "[a]bsolutely" depends on him. William is Duncan-Hurst's most significant asset. Without him, "there is no value to the firm." This opinion was corroborated by Hurst, several pension consultants and institutional stock brokers, as well as several Duncan-Hurst employees. Carol's own industry expert, Kenneth Bodenstein, testified William performs all critical functions at Duncan-Hurst and is "largely responsible" for Duncan-Hurst's success.

William presented evidence of his reputation as one of the nation's top investment advisers for more than 10 years. Duncan-Hurst's reputation is

attributable to William's skills and efforts. His skills, industry and guidance enable him to make all investment decisions for 97 percent of assets under management. Without William's guidance, clients will not remain with the firm. Thus, the value of Duncan-Hurst is derived not from its capital assets, but from the professional investment advisory services William provides to plan sponsors.

Carol claims Duncan-Hurst's increased value was not solely dependent on William, but rather on a "confluence of major factors."[6] Citing *In re Marriage of Green, supra,* 213 Cal.App.3d at page 21, and *In re Marriage of Stevenson, supra,* 20 Cal.App.4th at page 253, Carol asserts the exception of section 2552, subdivision (b) applies only if the change in value of a business is due *entirely* to the efforts of the operating spouse. However, *Green* and *Stevenson* stand for the proposition that "valuation as of the separation date—not the trial date—generally is the proper approach whenever the value of an asset (especially a business) devolves largely from the personal skill, industry and guidance of the operating spouse, [rather than] the underlying capital." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 8:1384, pp. 8-330 to 8-330.1, italics omitted.) Nothing in section 2552, subdivision (b), case law or logic requires the court to find the *entire* postseparation change in value was due *exclusively* to the personal efforts of the operating spouse in order to apply an alternative valuation date.

Nevertheless, Carol argues the increase in Duncan-Hurst's value after separation resulted from contractual fees paid by its clients for funds under management, regardless of William's efforts. However, the record shows William's efforts include managing 97 percent of all assets. He selects the stock in his portfolios based on his own methodology and criteria. According to Carol's expert, "the key element to Duncan-Hurst is its investment strategy" and "the key element to Duncan-Hurst investment strategy and process is [William]." The variation in portfolio value is a result of William's investment decisions, which directly impact Duncan-Hurst fee revenues. William's skill, reputation and proven track record allow him to obtain new clients and retain existing ones. Further, he plays a central role in marketing by actively participating in every final interview with prospective clients, who compare William's performance to that of his competitors without regard to the overall performance of the equities market. Contrary to Carol's position, William does affect the aggregate total of assets under management.

Carol argues much of Duncan-Hurst's increased value resulted from the growth of funds under management during marriage. This argument is based

---

[6]Carol unsuccessfully advanced this argument at trial and again in her proposal for additions to the court's statement of decision.

on the erroneous assumption that clients, making predictable or mandatory contributions on an ongoing basis, are locked into doing business with Duncan-Hurst. After Duncan-Hurst is hired to manage pension plan funds, the plan sponsors and pension consultants continue to monitor William's performance to determine whether he should continue to manage those funds. Duncan-Hurst's clients can almost instantaneously withdraw their funds if they are not satisfied. The fact that clients have remained with Duncan-Hurst is directly attributable to William's outstanding performance, which continued after separation. His skills and reputation are crucial to retaining assets under management because he is the only person at Duncan-Hurst with a track record to manage small-cap and mid-cap portfolios.

Carol also claims Duncan-Hurst's increased value is due to a flourishing stock market. However, the record shows Duncan-Hurst's success is based on William's active trading of stocks on a daily basis and is not tied to any stock index. During the relevant period, William sometimes overperformed and sometimes underperformed various indices. His performance does not track the stock market in that he does not purchase the same stocks as are in any particular index. He selectively purchases stocks, and sells based on his criteria and methodology at a time and in an amount he considers appropriate. Duncan-Hurst's success results from William's buy, sell or hold decisions with respect to each stock.

Carol asserts William was not the entire business because Duncan-Hurst promoted itself as a "team effort." However, when questioned about the role of staff at Duncan-Hurst, industry expert Lovell testified that "no knowledgeable pension consultant or potential buyer would ever confuse these support functions with the true key to the value of Duncan-Hurst—the investment skill, reputation and track record of [William]." William's track record and reputation are marketed to clients, who have a fiduciary duty to choose the best investment adviser. Contrary to Carol's position, Hurst is not critical to Duncan-Hurst's success. A marketing director such as Hurst can do little to assure client satisfaction if William's investment performance does not meet the plan sponsor's standards. Indeed, a pension consultant who bases his recommendation on a relationship with a marketing director breaches his professional duties to a plan sponsor.

Further, William assists both Magee and McNally on a daily basis. Neither Magee nor NcNally has brought clients to Duncan-Hurst. Based on his 20 years of experience and unique investment style, William generates his own investment ideas, initiates research by analysts, provides direction and focus, and sets forth investment criteria. He makes trade or hold decisions independently.

As the overwhelming evidence showed, and even Carol's expert conceded, William was "largely responsible for the success of Duncan-Hurst." Thus, the court acted well within its discretion in finding that good cause existed under section 2552, subdivision (b) to value Duncan-Hurst as of the date of separation.

## II

### *Attorney Fees*

 Carol contends the court abused its discretion in denying her request for attorney fees. She asserts the cost of litigation should have been apportioned equitably between the parties in accordance with their relative circumstances under section 2032, subdivision (a).

### A

Under section 2030, subdivision (a), "the court may, upon (1) determining an ability to pay and (2) consideration of the respective incomes and needs of the parties in order to ensure that each party has access to legal representation to preserve all of the party's rights, order any party . . . to pay the amount reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding." The purpose of such an award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy. (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768 [209 Cal.Rptr. 354, 691 P.2d 1020]; *In re Marriage of Ward* (1992) 3 Cal.App.4th 618, 627 [4 Cal.Rptr.2d 365].)

The court may award attorney fees under section 2030 "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)

"In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

"The court may order payment of an award . . . from any type of property, whether community or separate, principal or income." (§ 2032,

subd. (c).) The parties' "circumstances" as described in section 4320[7] include assets, debts and earning ability of both parties, ability to pay, duration of the marriage, and the age and health of the parties. Further, "[i]n assessing one party's relative 'need' and the other party's ability to pay, the court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1167 [62 Cal.Rptr.2d 466]; *In re Marriage of Terry* (2000) 80 Cal.App.4th 921, 933 [95 Cal.Rptr.2d 760].)

■ "[A] motion for attorney fees and costs in a dissolution proceeding is left to the sound discretion of the trial court. [Citations.] In the absence of a clear showing of abuse, its determination will not be disturbed on appeal." (*In re Marriage of Sullivan, supra,* 37 Cal.3d at pp. 768-769.) Thus, we affirm the court's order unless " 'no judge could reasonably make the order made. [Citations.]' " (*Id.* at p. 769; see also *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866 [89 Cal.Rptr.2d 525].)

**B**

Carol claimed she had incurred attorney fees of $1.4 million, $190,000 of which were paid from community funds under a prior court order. She sought reimbursement for the rest. The court had previously found, in connection with spousal support issues under section 4320, that Carol was highly educated and had worked as a certified public accountant in various accounting positions. The length of the marriage was relatively short (five years seven months) and the marital standard of living was very high. Carol was 46 years old and in good health; William was 54 years old and in good health. In accordance with the court's order following the third phase of trial, William paid Carol $4,734,541.88 in cash, excluding child support, on September 1, 1998. Based on Carol's income and expense declaration dated November 10, 1998, the court found she had an estate of $11,644,822, including $2,527,375 in liquid assets, and an imputed monthly income of $61,618, based on her earning capacity and interest income.[8] The court found William's monthly income was 10 times greater than that of Carol. Having paid Carol $4,734,541.88, William had $337,625 in remaining liquid assets and $4,051,702 in other property.[9]

In ruling on Carol's request for attorney fees, the court noted both parties had sufficient resources from which to fund the litigation, making this an

---

[7]Section 4320 lists the factors that govern an award of spousal support.

[8]During the pendency of the case (Apr. 1995 to Aug. 1998), Carol received $90,000 per month in spousal support and $20,000 per month in child support.

[9]The court did not include the value of Duncan-Hurst in this amount because William's entire interest in the business was pledged to secure his promissory note to Carol for the remaining money he owed her to equalize the property division.

unusual case for a finding of "need." Based on the relative circumstances of the parties, the court denied Carol's request for an award of fees and costs.

■ Carol asserts the court abused its discretion in denying her request for attorney fees because she had no earned income and William earned more than $1 million per month. While acknowledging she has substantial assets, Carol claims William's superior ability to pay makes a fee award just and reasonable under section 2030.

In determining need, the court was required to, and did, consider the parties' relative circumstances. Those circumstances included the parties' income, expenses and assets. The court considered the discrepancy in the parties' incomes, but also considered Carol had far greater liquid assets. Although section 2032, subdivision (b) permits an award to a spouse, such as Carol, who has sufficient resources to pay, it does not "endorse any fixed measure or percentage as a way to demonstrate need or the lack thereof." (*In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 883 [69 Cal.Rptr.2d 480].) Both Carol and William had adequate resources to litigate the controversy. Thus, the court acted well within its discretion in denying Carol's request for attorney fees.

*William's Appeal*

*Method of Valuation*

■ William contends the court erred in valuing Duncan-Hurst by using unadjusted comparable sales of investment advisory firms that included long-term employment contracts. He asserts this method of valuation impermissibly includes his postseparation efforts in violation of section 771, subdivision (a).[10]

A

■ Under section 2550, the court must divide the community estate of the parties equally. In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. (*In re Marriage of Connolly, supra,* 23 Cal.3d at p. 603; *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924 [72 Cal.Rptr.2d 856, 952

---

[10]That section provides the "earnings and accumulations" of a spouse after separation are that spouse's separate property. (§ 771, subd. (a).)

P.2d 1124].) The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal. (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 88 [16 Cal.Rptr.2d 575]; *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 885 [191 Cal.Rptr. 392].)

"[T]he determination of the value of infrequently sold, unlisted, closely held stock is a difficult legal problem. Most of the cases illustrate there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock. [Citation.] It is, therefore, incumbent upon a court faced with such a problem to review each factor that might have a bearing upon the worth of the corporation and hence upon the value of the shares." (*In re Marriage of Hewitson, supra,* 142 Cal.App.3d at p. 888.)

■■■ In the exercise of its broad discretion, the trial court "makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each. The trial court is not required to accept the opinion of any expert as to the value of an asset." (*In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 753 [214 Cal.Rptr. 661]; see also *In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 583 [117 Cal.Rptr. 49] [in establishing value of goodwill, opinion evidence is admissible but not conclusive].) Differences between the experts' opinions go to the weight of the evidence. (*In re Marriage of Bergman, supra,* at p. 752; *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 351 [209 Cal.Rptr. 764].) Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties. (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 107 [113 Cal.Rptr. 58].)

B

After ordering an alternative valuation date, the court heard evidence from various experts as to the value of Duncan-Hurst. The evidence showed that as of the date of separation, Duncan-Hurst had assets under management of approximately $1.1 billion and revenues of $10.2 million. Carol's expert, Kenneth Bodenstein, used two methods to value the community interest in Duncan-Hurst at nearly $21.8 million: comparable public company sales and comparable sales of public and private companies. The court rejected both methods because they included sales of publicly traded companies and thus were not "comparable." (See *In re Marriage of Hewitson, supra,* 142 Cal.App.3d at p. 886; *In re Marriage of Lotz* (1981) 120 Cal.App.3d 379, 384 [174 Cal.Rptr. 618].)

William's expert, Donald Gursey, used three different valuation methods: gross revenue multiplier, buy/sell agreement, and comparable sales of privately held companies. In his comparable sales analysis, Gursey found the value of Duncan-Hurst to be between $16.7 million and $25.5 million and the community's interest to be between $13 million and $19.8 million. However, Gursey hypothesized a "post-separation efforts adjustment" to reduce the appraised value of the community interest in Duncan-Hurst to a range of $4.3 million to $6.6 million. Gursey explained the value calculated using the comparable sales method was derived from comparisons with several private company stock transactions, all of which included an employment contract for key executives for a minimum of five years. He claimed that without a five- to ten-year employment contract for William, the value of Duncan-Hurst was questionable. He concluded: "Since [William's] post-separation efforts are his separate property, if the comparable sales transactions are to be used, there must be appropriate adjustment . . . so that the values and multipliers used do not improperly introduce the value of [William's] post-separation efforts into the calculations. To accomplish this adjustment, we have calculated . . . 66.7 [percent] as the minimum required figure and have incorporated it as a discount to the indicated value."[11]

After "critically considering all of the expert testimony," the court found: "[T]he comparable sales transaction approach utilizing comparable private company transactions is the approach which will most effectively achieve substantial justice between the parties. The Court, therefore, adopts the valuation opinion of Mr. Gursey. However, the Court cannot make the adjustment proffered by [William] regarding a hypothetical long-term employment contract because there is no actual contract in existence or contemplated, and its possibilities are too speculative at this time." Relying on Gursey's expert testimony, the court found the total value of Duncan-Hurst was $25.5 million, and the value of the community interest was $19.8 million.

C

■ As William correctly points out, the court may not value business goodwill by "any method that takes into account the postmarital efforts of either spouse." (*In re Marriage of King, supra,* 150 Cal.App.3d at p. 309; see

---

[11]Gursey presented no evidence as to the specific nature of the employment agreements in the comparable transactions, nor did he correlate the value of these agreements to the value of the businesses. Further, Gursey did not attempt to justify his selection of 66.7 percent as the appropriate adjustment percentage. Because there was no adequate foundation for Gursey's opinion testimony about the value of Duncan-Hurst based on an adjustment for a hypothetical long-term contract, the court properly declined to rely on it. (See *In re Marriage of Hewitson, supra,* 142 Cal.App.3d at p. 886.)

§ 771, subd. (a).) However, "a proper means of arriving at the value of such goodwill contemplates any legitimate method of evaluation that measures its present value by taking into account some past result." (*In re Marriage of Foster, supra,* 42 Cal.App.3d at p. 584.) In this regard, the value of goodwill existing at the time of marital dissolution is separate and apart from the expectation of the spouses' future earnings. (*In re Marriage of Fortier* (1973) 34 Cal.App.3d 384, 388 [109 Cal.Rptr. 915].) Recognizing these principles, the court here evaluated the business by taking into account the commercial reality that a long-term employment contract is ordinarily included in the sale of a closely held corporation such as Duncan-Hurst and that William would be compensated for his future services as an employee by earning a salary in addition to receiving a certain amount for entering into the contract. The court valued Duncan-Hurst without including any potential or continuing income to William, and thus without implicating section 771, subdivision (a). (*In re Marriage of Lotz, supra,* 120 Cal.App.3d at p. 383; *In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1313-1314, fn. 2 [285 Cal.Rptr. 479].)[12]

For present valuation purposes, an employment contract is the separate property of the employee spouse only if such a contract has actually been negotiated as part of the sale of the business. "However, it is inappropriate when awarding the property to one spouse to reduce the value of the business by the speculative value of a hypothetical [employment] agreement." (*In re Marriage of Czapar, supra,* 232 Cal.App.3d at p. 1314.) An employment contract negotiated in conjunction with the sale of a business is simply a means of protecting the value of the business goodwill. Until such a contract has actually been negotiated in light of the needs of the buyer and seller, it is too speculative to consider as part of the business's valuation. (*Id.* at p. 1315.) The court may not consider speculative factors when valuing community assets. (*Ibid.*; see also *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 749, fn. 5 [131 Cal.Rptr. 873, 552 P.2d 1169] [court may not consider tax consequences of an order dividing community asset unless tax liability is immediate and specific and will arise in connection with division of the community property]; *In re Marriage of Stratton* (1975) 46 Cal.App.3d 173, 175-176 [119 Cal.Rptr. 924] [value of community property home

---

[12]Valuing goodwill necessarily takes into consideration future income because the definition of "goodwill" is "expectation of continued public patronage." (Bus. & Prof. Code, § 14100; *In re Marriage of King, supra,* 150 Cal.App.3d at pp. 308-309.) Viewed this way, Duncan-Hurst has value only to the extent it is an ongoing business, and that value was awarded to William as his separate property. Nevertheless, Carol was entitled to her share of the current cash value of the business at the time of separation. The court accomplished this by declining to adjust the value by a hypothetical price paid for William's future efforts and earnings based on the expected continuity of his employment. (See *In re Marriage of Foster, supra,* 42 Cal.App.3d at p. 584.)

should not be reduced by costs of sale when court has awarded home to one party and there is no evidence that party intends to or is required to sell it].)

■ Although Gursey valued Duncan-Hurst based on a hypothetical sale that included a long-term employment contract, the fact remains that Duncan-Hurst was not being sold and William had no employment contract. Regardless of the certainty that a long-term employment contract would be required upon the sale of Duncan-Hurst, the court was not required to speculate on or consider such a consequence in the absence of·proof a sale did occur during the marriage or will occur in connection with the division of the community property. (See *Weinberg v. Weinberg* (1967) 67 Cal.2d 557, 566 [63 Cal.Rptr. 13, 432 P.2d 709]; *In re Marriage of Fonstein, supra,* 17 Cal.3d at p. 749, fn. 5.) The hypothetical probability William would be required to sign a long-term employment contract *if* Duncan-Hurst were sold was not a valuation factor the court was required to apply to achieve an equal division of existing community property. (*In re Marriage of Davies* (1983) 143 Cal.App.3d 851, 858 [192 Cal.Rptr. 212].) Because Carol should not be charged with the speculative cost of a speculative sale, there is no adjustment in value to be made against her share of the community property. (*In re Marriage of Fonstein, supra,* 17 Cal.3d at p. 750; *In re Marriage of Stratton, supra,* 46 Cal.App.3d at pp. 175-176.)

Moreover, the likelihood of William's selling Duncan-Hurst and entering into a long-term employment contract will depend on a number of variables, most of which are within his control. Consideration of these variables results in a speculative approximation of the value of William's ongoing efforts. If, for example, William sold Duncan-Hurst because he was retiring or had become incapacitated, there would be no employment contract. Thus, establishing a value for a future long-term employment contract, separate from the value of the business itself, is entirely too speculative. (*In re Marriage of Czapar, supra,* 232 Cal.App.3d at p. 1315.) "[O]nce having made [an] equal division [of community property], the court is not required to speculate about what either or both of the spouses may possibly do with his or her equal share and therefore to engraft on the division further adjustments reflecting situations based on theory rather than fact." (*In re Marriage of Fonstein, supra,* 17 Cal.3d at p. 749.) The true value of a future employment contract can only be determined with reference to William's circumstances at the time the business is sold. Thus, the court properly refused to introduce the speculative value of an employment contract into the process of determining the current fair economic value of a community property asset for equal division purposes. (See *In re Marriage of Lopez, supra,* 38 Cal.App.3d at p. 109.)

In his reply brief, William asserts the court should have rejected Gursey's comparable sales analysis in favor of his other valuation methods. However,

the court considered Gursey's gross revenue multiplier analysis and buy/sell agreement analysis but declined to follow them as the appropriate valuation method. As we previously discussed, the court has broad discretion to select a valuation method that will most effectively achieve substantial justice between the parties as long as that method is within the range of the evidence presented. (*In re Marriage of Cream, supra,* 13 Cal.App.4th at p. 88; *In re Marriage of Lopez, supra,* 38 Cal.App.3d at p. 107.) The court was entitled to accept Gursey's comparable sales analysis but reject his adjustment for a hypothetical long-term contract. Gursey's testimony provided sufficient evidence to support a value of $19.8 million for the community's share of Duncan-Hurst. (See *In re Marriage of Foster, supra,* 42 Cal.App.3d at p. 584.)

## DISPOSITION

The judgment is affirmed. Both parties to bear their own costs on appeal.

Benke, J., and Nares, J., concurred.

The petitions of both appellants for review by the Supreme Court were denied October 10, 2001.