Filed 8/20/14  Marriage of Molle CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of DANIEL LEE MOLLE and REBECCA JANE MOLLE | |
| DANIEL LEE MOLLE,<br><br>Appellant,<br><br>v.<br><br>REBECCA JANE MOLLE,<br><br>Respondent. | B245304<br>(Los Angeles County<br>Super. Ct. No.  KD077970) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rocky Lee Crabb, Judge.  Affirmed.

Law Offices of Jeffrey S. Benice and Jeffrey S. Benice for Appellant.

Robert D. Lipscomb for Respondent.

Appellant Daniel Lee Molle challenges a judgment entered in the underlying action regarding the dissolution of his marriage to respondent Rebecca Jane Molle. He contends the family court erred in valuing a community asset, namely, a business in which he has an ownership interest, determining his earning capacity, and issuing an award of attorney fees. We reject his contentions and affirm.

## FACTS

A. *Background*[1]

Daniel and Rebecca married in 1985, and soon had two children.[2] Rebecca was a homemaker and "soccer mom," and Daniel worked as an elevator technician. In 1992, Daniel met Kelli Clarke, whom he dated for a period.

In 1999, Daniel formed a closely held corporation, Superior Alliance Elevator Corporation (Superior), which maintains, repairs, and upgrades elevators. Daniel held a 75 percent interest in Superior, whose business arose primarily from elevator maintenance contracts. Superior had 10 employers, six or seven of whom were elevator technicians. Aside from acting as Superior's president, Daniel worked as an elevator technician.

In 2008, Daniel began dating Clarke again. After Superior hired Clarke as a consultant, she became Superior's operations manager. On January 2010, Daniel and Rebecca separated.

B. *Underlying Action*

On January 25, 2010, Daniel initiated marital dissolution proceedings. The parties reached agreements on several matters, but were unable to resolve their

---

[1]     Our summary of the background facts relies on findings of the family court not challenged on appeal.

disputes regarding the value of the community interest in Superior, spousal support, and attorney fees.[3] Among Rebecca's contentions was a claim that Daniel misappropriated funds from Superior with Clarke's assistance.

### 1. *Trial*

On August 20, 2012, trial began on the issues in dispute. The limited record before us discloses that the following evidence was presented.[4]

### a. *Daniel's Case-In-Chief*

Daniel testified that although he had three partners when he created Superior, after 2003 only he and William Lee held ownership interests in Superior. Daniel owned 1,000 shares of Superior's stock, which represented 75 percent of the total stock.[5] Lee was responsible for Superior's "financials," and worked out of an office in his home. Daniel acted as Superior's president, and managed the field labor, employees, and jobs.

Daniel further testified that in or after 2005, Superior encountered financial difficulties because Lee failed to bill clients for services. Daniel discovered that Lee had misused Superior's credit cards and engaged in other improper conduct. In November 2010, Daniel filed a lawsuit against Lee. In June 2012, Lee agreed to

---

[2]     Because the key parties share a surname, we refer to them by their first names. (*In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 803, fn. 2.)

[3]     By the time of the dissolution action, Daniel and Rebecca's children were adults.

[4]     The reporter's transcript provided by Daniel omits the testimony of his valuation expert, James O'Leary, and lacks portions of the direct examination, cross-examination, and re-direct examination of Rebecca's valuation expert, Robert MacBurney.

[5]     Although Daniel testified that he believed his shares represented 66 percent of Superior's stock, his counsel conceded that Daniel owned 75 percent. The parties further agreed that at the time of trial, Lee's wife owned the remaining 25 percent.

3

the entry of a judgment that obliged him to pay Daniel and Superior $850,000, and give back his stock in Superior. Daniel acknowledged that the judgment was not listed as an asset in Superior's financial records. According to Daniel, the judgment was "uncollectable" because Lee had no resources to pay the judgment.

Daniel further testified that he first met Clarke in 1992, when they had a dating relationship. In March 2008, they began dating again. In 2008 or 2009, Superior hired Clarke as a consultant to assist with its financial operations. Her tasks included bookkeeping and the reconciliation of Superior's credit card records. In 2011, after the "corporate lock out" of Lee, Clarke became Superior's operations manager, overseeing its budget, insurance, and "financials."

According to Daniel, Clarke occasionally loaned funds to Superior, and permitted Superior to use her house in Rancho Cucamonga as a business location. Superior paid Clarke's son $3,600 per month as the house's property manager. Clarke did not live in the house, which was occupied by a subcontractor who performed vehicle maintenance for Superior. Superior's shipments were sent to the house, and several employees worked there.

Daniel further testified that in 2010, he underwent foot surgeries that disabled him, and that Superior paid him no salary. He acknowledged that during 2010, he charged over $100,000 to Superior's credit cards, but maintained that all but $20,000 of those expenses were for business purposes. He also acknowledged that in 2010, Superior paid all the expenses related to his use of a Dodge Viper.

Daniel further testified that from January 2012 to the time of the trial in August 2012, he drew only $26,000 in salary, even though Superior's annual gross revenues ranged from $3.5 to $3.7 million. Daniel stated that Superior had little income to pay his salary, in view of its high operating expenses and debts. He also

4

maintained that Superior was obliged to pay certain outstanding taxes and union fines. Daniel opined that at the time of trial, Superior had no positive net value.

Clarke denied that she and Daniel renewed their dating relationship in early 2008. According to Clarke, she had experience as an administrator in several businesses. In 2008, Daniel contacted her, described problems he had at Superior, and sought her assistance.

Clarke further testified that she discovered deficiencies in Lee's billing and bookkeeping practices. In examining Superior's operations, she found checks with Daniel's forged signature, improper fund transfers, misuse of Superior's funds, and inaccurate bookkeeping. Moreover, an Internal Revenue Service audit of Superior for 2008 showed improperly documented personal uses of Superior's credit cards. According to Clarke, she attempted to root out financial irregularities, and believed that she had rectified 80 percent of them.

Clarke also testified regarding her own financial circumstances, and denied that Daniel used her to extract funds from Superior. According to Clarke, a dissolution action regarding her marriage began in mid-2008. She received no funds through the eventual marital settlement agreement. She acknowledged that in July 2008, she filed an income and expense declaration in that action stating that she earned $23.81 per hour in a position at the Hospice at the East Bay and had $240 in her bank accounts, but maintained that she failed to read the declaration before it was filed. She also acknowledged that in December 2008, she filed an income and expense declaration in her marital dissolution action stating that she earned $1,538 per week at the Hospice at the East Bay, had no "outside" income or income from self-employment, and held $5,803 in her bank accounts.

Clarke further testified that in late 2008 and early 2009, she bought a house in Rancho Cucamonga for $351,000. In July 2009, her bank accounts contained at

5

least $110,000. In August 2009, she made a $50,000 loan to Superior, which it soon repaid her. In October 2009, Lee agreed to pay Clarke approximately $2,100 per week for 21 hours per week as a financial consultant. Clarke performed most of her services for Superior from her home in Rancho Cucamonga. At the same time, she held a 40-hour per week position in West Covina. In January 2010, her bank accounts contained at least $173,000. In 2010 and 2011, Clarke made loans totaling $105,000 to Superior, which it repaid with interest.

James O'Leary, Daniel's valuation expert, opined that at the time of trial, Superior was worth $407,100.[6] That value represented a weighted average of estimates of Superior's worth derived from several distinct methodologies. O'Leary's calculation gave the greatest weight to the "Adjusted Book Value Method -- Going Concern" and the "Capitalization of Excess Earnings Method." In applying those methodologies, O'Leary relied on Superior's financial records.[7]

b. *Rebecca's Evidence*

Robert MacBurney, Rebecca's valuation expert, rejected O'Leary's application of the "adjusted book value" and "capitalization of earnings" methods, as those methodologies required accurate and reliable financial records for the period from 2008 to 2012.[8] According to MacBurney, the most recent year for

---

[6] Because Daniel has not included a reporter's transcript of O'Leary's testimony, our summary is based on the family court's statement of decision and the exhibits admitted at trial, including O'Leary's report.

[7] Aside from these witnesses, Corey Seitz, a Superior employee, testified that Superior paid $10,000 of an $18,000 union fine imposed on him for failure to pay his union dues. Stephen Souter, a vice-president of P. S. Elite Management, testified that Superior paid his company $3,000 per week to provide telephone-related services.

[8] MacBurney also testified that in valuing Superior, O'Leary erroneously overstated Superior's debts and tax liabilities.

which there was reliable financial documentation regarding Superior was 2008, as the Internal Revenue Service had audited Superior's 2008 corporate tax return. MacBurney further testified that the only reasonably credible financial information for the period from 2008 to 2012 concerned Superior's gross revenue, which was approximately $3.5 million to 3.7 million per year. In light of Superior's relatively stable gross revenue, MacBurney opined that at the time of trial, Superior was worth $2.3859 million, based the "market data" method, which relies on sales of comparable businesses.

MacBurney also testified regarding Daniel's "sustainable cash flow" from Superior. Based on Daniel's W2 statements for 2008 and 2009, as well as Superior's financial statements for 2008, MacBurney estimated that Daniel's earnings, employment benefits, and payments from Superior averaged $35,700 per month.[9] According to MacBurney, his estimate rested on "the most reliable last information" regarding Daniel's "sustainable cash flow."

In addition, MacBurney offered testimony regarding Clarke's financial circumstances while employed by Superior. Following an examination of Clarke's bank records, he determined that from January 2008 to June 2012, she deposited approximately $2.67 million in her bank accounts.

Rebecca testified that she and Daniel had lived "a really good life." They owned a large house, "nice cars," and several recreational vehicles. In addition, they had a barn for her horses. Until the early '90s, Rebecca devoted most of her time to raising their two children. From 1995 to 2003, she earned as much as

---

[9] MacBurney focused on Daniel's income in 2008, with adjustments to reflect information regarding his income in 2009. So adjusted, Daniel's total income for 2008 was $428,000. That sum encompassed Daniel's average annual earnings of $229,000 in 2008 and 2009 (as reflected on his W2 statements), $166,000 in dividends and additional

$20,000 per year as a part-time dental assistant until she developed carpal tunnel syndrome, which forced her to give up that employment. In 2006, she obtained a conditional license as a realtor, but was unable to keep it because her marital problems prevented her from acquiring required college credits. She also competed in horse riding competitions, from which she earned $12,000 in prizes in 2009.

### c. *Daniel's Rebuttal Evidence*

Clarke testified that the deposits to her bank accounts described by MacBurney reflected legitimate transactions with Superior, or otherwise were made for legitimate business purposes related to her employment. She further testified that after 2008, Superior's net income diminished, due to an increase in employee salaries and union dues, the imposition of penalties and interest for unpaid taxes, and a loss of lucrative "modernization jobs," that is, contracts involving the full replacement of elevators.

Daniel testified that Rebecca stopped working as a dental assistant solely because she disliked driving to work.

### 2. *Findings and Judgment*

Following trial, on September 4, 2012, the family court issued a tentative statement of decision, which became its final statement of decision. Regarding the community's interest in Superior, the family court found that Superior's financial records were unreliable, as maintained by Daniel and Clarke; that Daniel's and Clarke's testimony regarding Superior's diminished profits after 2008 was not

payments from Superior in 2008, and payments made by Superior for Daniel's use of the Dodge Viper in 2008.

credible; and that Superior's income had been diverted to Daniel's and Clarke's benefit in connection with Clarke's house. The court rejected O'Leary's valuation of Superior, noting that the information on which he relied was "of questionable validity." Based on MacBurney's testimony, the court determined that Superior's fair market value at the time of trial was $2.385 million, and thus concluded that the community's 75 percent interest in Superior was worth $1,788,750. The court awarded Superior to Daniel, and directed him to pay $894,375 to Rebecca.

Regarding spousal support, the family court found that the parties had lived at an upper middle class level. Relying on MacBurney's testimony regarding Daniel's "sustainable cash flow" from Superior, the court found that Daniel's earning capacity was $20,000 per month, in view of his 75 percent interest in Superior. After determining there was insufficient evidence to impute income to Rebecca, the court directed Daniel to pay $4,250 per month in spousal support.

Regarding Rebecca's request for an award of attorney fees, the court concluded that because Daniel had control of Superior, Rebecca "was required to chase the truth through litigation, which of course is often times an expensive effort." Based on declarations submitted by the parties and the testimony at trial, the court ordered Daniel to pay $75,000 "as a contributive share" of Rebecca's attorney fees and costs. On November 2, 2012, a judgment was entered reflecting the family court's determinations.

## DISCUSSION

Daniel challenges the sufficiency of the evidence to support the family court's determinations regarding Superior's value and Daniel's earning capacity. In addition, in view of those purportedly erroneous determinations, Daniel

9

contends the court abused its discretion in issuing the fee award to Rebecca. As explained below, Daniel has failed to establish his contentions.

A. *Limitation of Daniel's Contentions Due to Incomplete Record*

At the outset, we examine the extent to which the partial record provided by Daniel circumscribes the challenges that he may assert on appeal. "A fundamental rule of appellate review is that '"[a] judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown."'" [Citations.]" (*Conservatorship of Rand* (1996) 49 Cal.App.4th 835, 841, italics omitted.) To overcome this presumption, appellants must provide an adequate record that demonstrates error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295.) As explained below, Daniel's failure to provide a full reporter's transcript of the trial limits the scope of his challenges to the sufficiency of the evidence.

The record before us omits the testimony of Daniel's expert, O'Leary, significant portions of the testimony of Rebecca's expert, MacBurney, as well as the declarations submitted by the parties pertinent to Rebecca's fee request. In the absence of a complete evidentiary record, we must presume that the evidence supports the family court's determinations regarding Superior's value, Daniel's earning capacity, and Rebecca's entitlement to a fee award, unless error appears on the face of the record. (*National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 521-522; *Ehrler v. Ehrler* (1981) 126 Cal.App.3d 147, 154 (*Ehrler*).) Rule 8.163 of the California Rules of Court (rule 8.163) provides: "The reviewing court will presume that the record in an appeal includes all matters material to deciding the issues raised. If the appeal proceeds without a reporter's

transcript, this presumption applies only if the claimed error appears on the face of the record."

The courts have long interpreted rule 8.163 to mean that an appellant who proceeds on a partial evidentiary record must provide a record capable of establishing the kind of error the appellant asserts. As explained in *Utz v. Aureguy* (1952) 109 Cal.App.2d 803, 806-807, under that rule, "if an error appears on the face of a judgment roll or other partial transcript it is not to be presumed on appeal that the error was cured by some proceeding not appearing in the transcript [citations][,] but it is still incumbent on an appellant to present a transcript which affirmatively shows on its face that an error occurred [citations]." Accordingly, in the case of challenges to the sufficiency of the evidence, error ordinarily cannot be shown in the absence of the full evidentiary record. (*In re Silva* (1931) 213 Cal. 446, 448; *Miller v. Checkeroski* (1963) 217 Cal.App.2d 590, 591.) This is because in examining such challenges, "the power of an appellate court *begins* and *ends* with the determination as to whether*, on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact] . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Although Daniel broadly maintains there is insufficient evidence to support the family court's rulings, the primary focus of his contentions is on MacBurney's expert testimony. Generally, "an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] . . . ." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771 (*Sargon Enterprises*) ["An expert opinion has no value if its basis is unsound," quoting *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564].) Daniel

11

argues MacBurney's testimony regarding Superior's value, Daniel's earning capacity, and other matters was too speculative or conjectural to constitute cognizable evidence.

As noted, Daniel failed to include the entirety of MacBurney's testimony. In view of the principles discussed above, Daniel has forfeited his challenges to the sufficiency of the evidence, with the exception of certain limited contentions potentially capable of being established by the partial record, namely, that the family court based some findings solely on testimony from MacBurney that indisputably constituted speculation. As explained below, we reject those contentions; moreover, notwithstanding the limited record, we would also reject Daniel's other challenges to the sufficiency of the evidence were we to address them, as the partial record discloses ample evidence to support the family court's rulings.

B. *Unreliability of Superior's Financial Records*

We begin with Daniel's challenge to the family court's finding that Superior's financial records were insufficiently reliable to support O'Leary's valuation. Daniel argues that the finding relied solely on speculation from MacBurney. However, for the reasons discussed above (see pt. A., *ante*), Daniel has forfeited his contention, as the family court's statement of decision establishes that it predicated the finding on evidence from several witnesses, including Daniel's expert O'Leary. Furthermore, we would reject the contention were we to examine it.

"We review factual findings of the family court for substantial evidence, examining the evidence in the light most favorable to the prevailing party. [Citation.] In reviewing evidence on appeal, all conflicts must be resolved in favor

12

of the prevailing party, and all legitimate and reasonable inferences must be indulged in order to uphold the trial court's finding. [Citation.] In that regard, it is well established that the trial court weighs the evidence and determines issues of credibility[,] and [that] these determinations and assessments are binding and conclusive on the appellate court. [Citation.]" (*In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1051-1052.)

Here, MacBurney testified that he had examined Superior's financial records. According to MacBurney, Superior lacked sufficient source documentation to ensure the reliability of the financial statements upon which O'Leary relied for his valuation. MacBurney's review of the use of Superior's credit cards disclosed charges totaling $833,000 for which there was no documentation establishing that the charges were business-related. MacBurney further testified that after 2008, when Clarke had few assets, she "acquire[d] a new home, [got] a new car, and ha[d] hundreds of thousands of dollars in bank accounts." From 2008 to 2012, Clarke deposited over $2.6 million into her own accounts. MacBurney also testified that in 2010, when Daniel was purportedly receiving only disability payments, he deposited $110,000 in his bank accounts, often in the form of cash, and charged $104,000 on Superior's credit cards.

Clarke too provided testimony that undermined the credibility of Superior's financial records. She acknowledged that in 2008, she filed income and expense declarations stating that she had less than $6,000 in her bank accounts, and that she later made loans to Superior totaling at least $155,000. In addition, she testified that in 2011, when she gained full access to Lee's financial records, she found so many "miscategorizations" that she wanted to "zero[] out" his books and "start[] over," but did not do so due to the litigation against Lee. There is thus ample

evidence to support the family court's finding regarding the unreliability of Superior's financial records.

Daniel contends that MacBurney's testimony was speculation, arguing that MacBurney conceded he found no evidence that Daniel or Clarke took funds not properly documented as a loan repayment, salary payment, or business expense. We disagree. MacBurney maintained that the evidence, viewed as a whole, demonstrated the unreliability of Superior's books, notwithstanding the absence of certain types of conclusive "smoking gun" evidence.

Although MacBurney acknowledged that he found no document expressly showing an improper transfer from Superior to Clarke's bank accounts, he noted that Clarke had supplied only redacted bank statements that omitted descriptions of many deposits. Although MacBurney also acknowledged that he found no document expressly showing that Daniel improperly transferred funds from Superior to his own bank account, he observed that many of Daniel's deposits were in cash, and that Daniel testified in his deposition that he did not document his credit card use to establish whether he incurred business expenses. In response to an inquiry whether Superior's credit card transactions appeared in its records, MacBurney agreed that "[t]here [was] nothing off the books trying to be hid," but nonetheless maintained that Superior's books were unreliable, in view of the lack of documentation regarding the purpose of many of the credit card transactions.

Viewed in context, MacBurney's remarks cannot reasonably be regarded as rendering his testimony speculation. Accordingly, Daniel has failed to show error in the family court's finding regarding the unreliability of Superior's financial records.

C.  *Valuation of Superior*

We turn to Daniel's challenge to the family court's valuation of Superior, which relied on MacBurney's expert testimony.


1.  *Governing Principles*

Generally, the family court is obliged to divide the community estate equally.  (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631-632 (*Duncan*).)  "In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division.  [Citations.]  The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal.  [Citations.]"  (*Ibid*.)

Here, the family court was required to divide Superior, a closely held corporation.  "'The determination of the value of infrequently sold, unlisted, closely held stock is a difficult legal problem.  Most of the cases illustrate there is no one applicable formula that may be properly applied to the myriad factual situations calling for a valuation of closely held stock.  [Citation.]'"  (*Duncan*, *supra*, 90 Cal.App.4th at p. 632, quoting *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 888 (*Hewitson*).)

The family court has "broad discretion" to assess the value of a closely held corporation, for purposes of allocating it to the parties.  (*Duncan*, *supra*, 90 Cal.App.4th at p. 632.)  In exercising that discretion, the court "'makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each.  The trial court is not required to accept the opinion of any expert as to the value of an asset.'

15

[Citations.]  Differences between the experts' opinions go to the weight of the evidence.  [Citations.]  Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties.  [Citation.]"  (*Duncan*, *supra*, at p. 632, quoting *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 753.)

### 2.  *Evidence and Findings*

Relying on the "market data" method, MacBurney estimated Superior's value at the time of trial to be $2.3859 million.  In applying that method, MacBurney noted that from 2008 to 2012, Superior's gross revenue was approximately $3.5 million to 3.7 million per year.  After consulting several databases, MacBurney found five closed sales of businesses comparable to Superior in the standardized category for elevator installation, conversions, and repairs.  Those sales occurred between 1999 and 2008, and involved businesses located outside of California with gross revenues from $596,000 to $1,559,296.  MacBurney found that the ratios of the sales price to the gross revenue for the transactions ranged from 1.44 to .513.  To compensate for potential differences between Superior and the other businesses, MacBurney focused on the two transactions with the lowest ratios, which occurred in 2004 and 2008, and determined that the appropriate ratio of sales price to gross revenue for his evaluation was .6.  Applying that ratio to Superior's estimated gross revenue for 2012, McBurney arrived at his opinion regarding Superior's value.

As additional support for that opinion, MacBurney pointed to the "capitalization of [excess] earnings" method, as employed by O'Leary.  MacBurney testified that if O'Leary, in applying that method, had used the reliable financial data from 2008, rather than certain ill-founded figures that O'Leary

16

derived from Superior's records, O'Leary would have arrived at a valuation for Superior very close to MacBurney's estimate of Superior's value.

Noting that the parties' experts effectively agreed that Superior's gross revenue was approximately $3.6 million annually from 2008 to 2012, the court accepted that figure as "a true fact." The court also adopted MacBurney's valuation of Superior, stating that MacBurney's "conservative .6 ratio factor derived from the five comparable sales is a reasonable method of calculating fair market value, particularly where the books and records of Superior are not otherwise generally reliable." The court further noted that MacBurney had performed a "sanity check" regarding his estimate, that is, tested it against O'Leary's application of the "capitalization of excess earnings method," as adjusted to reflect reliable financial information from 2008.

### 3. *Daniel's Contention*

Daniel asserts that on cross-examination, MacBurney admitted his valuation of Superior was flawed because the comparable sales were too "remote." However, because Daniel failed to include that testimony in the record, he has forfeited his contention of error. (See *Ehrler*, *supra*, 126 Cal.App.3d at pp. 153-154 [appellate courts do not review "evidence" described only in a party's trial brief].)

Furthermore, to the extent Daniel suggests that the limited record demonstrates that MacBurney's valuation was speculation, his contention fails. The record shows that O'Leary and MacBurney agreed that the market data method is an acceptable approach to valuing a business; that MacBurney identified the sale of five comparable businesses; that he compensated for potential differences between those businesses and Superior by focusing on relatively recent

sales and adopting a conservative "sales price to gross revenue" ratio; and that he performed a "sanity check" on his valuation. In our view, the trial court did not err in crediting MacBurney's assessment of Superior's worth.

Daniel's reliance on *Sargon Enterprises, supra,* 55 Cal.4th at p. 771, *Hewitson*, *supra*, 142 Cal.App.3d 874, and *In re Marriage of Rives* (1982) 130 Cal.App.3d 138 is misplaced. In each of those cases, the reviewing court held that an expert's evaluation of a business failed to constitute substantial evidence, as the record demonstrated that the expert applied a defective method or made factually unfounded assumptions. (*Sargon Enterprises, supra*, at pp. 776-778 [in assessing small business's lost profits, expert improperly assumed future market share far greater than actual market share, and compared business to significantly larger businesses]; *Hewitson*, *supra*, at pp. 884-886 [expert erred in valuing a closely held corporation by reference to sales of large publicly traded corporations, in view of differences between the two types of corporation and the scarcity of comparable companies]; *In re Marriage of Rives*, *supra*, at pp. 150-151 [in valuing business, expert improperly assumed future production levels far greater than any actually achieved, and considered husband's post-marital contribution to business].) As explained above, the record before us discloses no such error. In sum, Daniel's challenge to the family court's valuation of Superior fails.[10]

---

[10]     In a related contention, Daniel argues that the family court's statement of decision improperly disregarded the effect of Lee's misconduct on Superior's value. However, because the record discloses no objections by Daniel to the statement of decision, we will imply any findings necessary to support the court's rulings. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132.) As the court expressly found that Superior's financial records were unreliable, it could reasonably have concluded that Daniel failed to show that Lee's misconduct diminished Superior's value at the time of trial.

18

D.  *Daniel's Earning Capacity*

Daniel contends the family court erred in finding that his earning capacity was $20,000 per month.  He argues that the court improperly credited MacBurney's "speculation" regarding his earning capacity, rather than accepting his own testimony regarding his earnings, which he characterizes as "uncontradicted."  We disagree.

Permanent spousal support is controlled by Family Code section 4320 and related statutes, which specify factors the family court must assess in determining the amount of support.  (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302-304, 320.)  Because a key factor is the supporting party's "ability to pay," which encompasses assets as well as income, the court may in suitable circumstances look beyond the supporting party's income to assets controlled by that party.  (*Id.* at pp. 304 -305.)  In this regard, "California courts have approved support awards based upon the earning capacity, instead of the actual income, of the supporting spouse in cases where '"it appears from the record that there is a deliberate attempt on the part of the [spouse] to avoid his [or her] financial family responsibilities . . . ."'" (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 232, quoting *In re Marriage of Nolte* (1987) 191 Cal.App.3d 966, 973.)

Here, the family court concluded that Daniel had engaged in that type of misconduct, as it found that Daniel kept unreliable financial records, offered untrustworthy testimony regarding Superior's financial condition, and diverted Superior's income to himself and Clarke.  Because Daniel has failed to provide a full evidentiary record, he may not challenge that conclusion on appeal; moreover, we would reject any such challenge were we to consider it, in view of the evidence disclosed in the partial record.

Nor can MacBurney's opinion concerning Daniel's "sustainable cash flow" be regarded as speculation. According to MacBurney, his opinion was predicated on the then most recent reliable information regarding Daniel's earning capacity, namely, Daniel's W2 statements for 2008 and 2009, as well as Superior's financial statements for 2008. We therefore reject Daniel's contention that MacBurney "speculated without evidentiary foundation." In sum, we see no error in the determination regarding Daniel's earning capacity.

E. *Attorney Fee Award*

Daniel challenges the award of attorney fees and costs to Rebecca, arguing that it relies on the family court's determinations regarding Superior and his earning capacity. As Daniel's contentions concerning those determinations fail, he has shown no error in the award.

**DISPOSITION**

The judgment is affirmed.  Rebecca is awarded her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

21