Filed 1/25/22  Marriage of Lane and Crouch CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re the Marriage of KATHERINE LANE and DAVID CROUCH. | A154434 |
| KATHERINE LANE, Appellant, v. DAVID CROUCH, Appellant. | (San Mateo County Super. Ct. No. F0122077) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |

**BY THE COURT:**

The opinion filed herein on December 27, 2021, is modified as follows:

1.     The paragraph beginning on page 36 and concluding on page 37 is deleted.  The first full paragraph on page 37 is deleted.  The first sentence of the second full paragraph on page 37 is deleted and replaced with the following:

1

Crouch is in plain effect challenging the sufficiency of the evidence to support the family court's determination that he had committed a breach of fiduciary duty that warranted an award under subdivision (g). As already noted, he is required to set out all of the pertinent evidence in his brief. (*Fink, supra*, 25 Cal.3d. 877, 887.) As he does with several other of his arguments, Crouch makes no attempt to satisfy this requirement.

2. The paragraph commencing on page 40 and concluding on page 41 is deleted and replaced with the following:

This evidence was more than ample to support the family court's determinations that Crouch had breached his fiduciary duties with respect to the Cunitz and Tang-Greenbaum transactions, and that his conduct warranted sanction according to subdivision (g) of section 1100. (*Schleich, supra*, 8 Cal.App.5th 267, 276.) We now turn to Lane's appeal that the court erred in not imposing the sanction authorized by subdivision (h).

This modification does not effect a change in the judgment. The petition for rehearing is denied.

Date: _____          _____Richman, Acting P.J.

Filed 12/27/21  Marriage of Lane and Crouch CA1/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of KATHERINE LANE and DAVID CROUCH. | |
| KATHERINE LANE, Petitioner and Appellant, v. DAVID CROUCH, Respondent and Appellant. | A154434 (San Mateo County Super. Ct. No. F0122077) |

This marital dissolution action is sadly typical for its protracted bitterness. It is notably untypical in that the case took five years to get to trial; the matter was submitted for decision only after, the family court's words, "32 days of trial and three days of closing argument"; the trial generated 30 volumes of reporter's transcripts; and the register of action requires 243 pages.  Issues of spousal and child support were determined, but are not challenged on appeal.  The same is true with respect to many other financial issues.

The most contentious issue concerns a construction company that was the main source of income and support for the family throughout

the marriage.  The family court found that David Crouch "singlehandedly impaired" Katherine Lane's "interest [in the business] by trying to destroy and/or dissipate it."  The court further found that Crouch "stopped working the . . . business," and went to work for Zega Builders, a construction company owned by a man who had been Crouch's partner before separating from Lane.  According to the court, Crouch "went to work for Zega, gave Zega his name, designs and reputation, all of which were critical to the business.  He . . . gave Zega his employees, trucks and other assets."  In short, in violation of his fiduciary duties to Lane, Crouch  essentially handed the business to Zega on a silver plate.  Then, as the trial was nearing its end, Zega paid Crouch $2.2 million, which Crouch called as a "bonus," a characterization the family court rejected.

Nevertheless, the family court concluded that Crouch's "breach of fiduciary duty . . . [did] not rise to the level of Family Code[1] [section] 1101[, subdivision] (h) which would have mandated [*sic*] an award" to Lane of "100% of the value" of the business.

Both parties have appealed the judgment.[2]

---

[1]   Statutory references are to this code unless otherwise indicated.

[2]   After the family court filed its Final Orders And Statement Of Decision, Crouch moved for reconsideration.  The court granted reconsideration to the extent that it issued Findings and Order After Hearing augmenting its reasoning in the Final Orders And Statement Of Decision.  Both parties treat the Final Orders as the functional equivalent of a final, appealable, judgment in their respective notices of appeal.  We think it takes both orders to make a final judgment, and construe both notices of appeal as reaching the two orders that together constitute an appealable judgment.

Crouch contends the family court erred in five ways: (1) in concluding he violated his fiduciary duties to Lane; (2) in valuing the business using the amount of the "bonus" paid him; (3) in "failing to credit [him] for the tax liability on the $2,200,000 payment received pre-judgment"; (4) in treating a parcel of real property as a community asset; and (5) in ordering him to make certain reimbursements. We conclude all of these claims are without merit.

On her appeal, Lane presents the most far-reaching contention. She argues that, having found that Crouch had violated his fiduciary duties, the family court erred in awarding her only half of the value of the business, not the 100% allowed by Family Code section 1101 (section 1101). There is authority for Lane's argument that in some situations it is "mandatory" for the family court to award one party the full value of the community asset. But "mandatory" is subject to a critical condition: the family court, as the trier of fact, has concluded that one or more of the criteria specified in the section's subdivision (h) has been proven. That was not the case here, where the trier of fact expressly found that the evidence of Crouch's manifold breaches of his fiduciary duties did *not* satisfy one of those criteria, namely, that Crouch was "guilty of oppression, fraud, or malice," the standard for punitive damages in civil actions that is incorporated by reference into section 1101.

Lane asks this court to conclude that the family court erred in not making that determination, and that correcting such error requires this court to decide that, because both fraud and malice are shown, as a matter of law, the criteria for a mandatory award are established by the record. In effect, Lane is proposing that this court should award

3

her punitive damages in the face of an express determination by the trier of fact not to award those damages. So far as we can discover, no California reviewing court has ever overruled such a decision by a trier of fact. This court will not be the first.

We will affirm the judgment.

**BACKGROUND**

The extensive record, viewed most favorably in support of the judgment (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694), supports the following recitals:

Crouch, who is Australian, met Lane in the United States in 1999. The following year, they moved to Australia and married. They moved back to California in 2002. They separated for good in July 2013, when Lane filed for dissolution of their marriage.

Crouch and Lane lived at 16 Anderson Way in Menlo Park. They lived on earnings from David Crouch Customs Homes (sometimes DCCH), whose primary business was designing and building single-family residences. It appears accepted by both parties that DCCH came into existence after the parties married. Crouch ran the business and oversaw its finances. Lane's involvement was minimal. She had no access to the firm's accounts, or Crouch's Australian bank accounts. Her involvement in the couple's personal finances was limited to use of one checking account for household expenses. Crouch made all deposits into this account. Lane was unaware that in 2007 Crouch bought land in Australia with community funds. Title was in his name alone.

It was soon after making this purchase that Crouch began pressing for the couple to return to Australia. This period also saw DCCH's operations severely and adversely impacted by the 2008

4

economic downturn. About 2011-2012, when the business returned to profitability, Crouch resumed pressuring Lane to move to Australia. With no great enthusiasm, she agreed, because Crouch had given her an ultimatum: "either I move to Australia with him, or he was going to leave the family. Divorce me—I don't have my name on anything—and he was going to take the kids." Lane agreed, but only "[b]ecause our marriage was in terrible shape, and I felt like he was trying to get me to Australia, file for divorce, and I wouldn't be able to bring the kids home."

In anticipation of the move, Crouch "stopped looking for work." "I was pretty much looking at walking away from the company, shutting it down. And then, at the eleventh hour, that's when I got contacted by Ken Friedman in late February, early March of 2013, [who was] interested about getting into the business." Crouch and Friedman discussed Friedman buying an interest in DCCH and making it a partnership. Crouch told Lane that Friedman was going to buy DCCH for $400,000. Friedman testified he thought that sum would only buy a half interest. Crouch did not tell Friedman of any intent to shut down DCCH when Crouch and Lane moved to Australia. Friedman started working—without pay—for several days a week at DCCH to gain "on-the-job training" in the construction business.

More concretely, in May 2013, Friedman and his wife entered into a joint venture with Crouch and Lane for the purchase, remodel, and resale of 5 Carolina Lane in Atherton. The Friedmans loaned Crouch and Lane $2 million (half of the purchase price). Title to the property was transferred to an LLC. Shortly thereafter, Crouch—who had previously claimed not to be "liquid"—paid back $1 million.

5

In May 2013, Crouch, Lane, and their two children moved from their Anderson Way home into the unrenovated Carolina Lane property. Two months later, Lane and the children moved back to Anderson Way, and she filed for dissolution.

According to Friedman, he created Zega Builders in August of 2013 "but there was nothing in it until June of 2014 . . . , when I started to make payroll." In June and July 2014, Crouch joined a number of former DCCH workers—whom Crouch had fired from DCCH—as employees of Zega. As of that time DCCH "was running out of money and . . . pretty much all [its] projects were finished up for Carolina, and by that point, I [Friedman] owned Carolina." Zega paid Crouch $12,000 per month for 32 hours work, later increasing to $180,000 annually for full-time work. Prior to joining, Zega, the DCCH workers had been "supervised" by Friedman on DCCH work. Zega completed a number of projects that had been started by DCCH. Friedman testified that he expected Crouch to bring to Zega any new projects that might come his (Crouch's) way.

In February 2014, Crouch and Lane sold their interest in the Carolina Lane property to the Friedmans in exchange for return of the $1 million already paid, and discharge of all other obligations and debts relating to the property.

In addition to whatever salary he drew from Zega, between July and September of 2016, Crouch was twice "loaned" $100,000 by Zega. Neither was memorialized in writing. Neither produced discussion of repayment by Crouch.

On March 16, 2017, Crouch testified that he received only one "bonus" from Zega, for $100,00, at the end of 2016. Two months later,

6

on May 15, 2017, as the trial was nearing its end, Crouch testified that within the prior 30 days, he received "additional compensation" of $2.2 million that was deposited in the DCCH account. Crouch did not object when his counsel termed this payment a "bonus."

Additional information will be provided as needed in connection with discussion of the parties' contentions on these appeals.

## DISCUSSION

### I. The Business

### A. The Governing Law

"[A]ccountability for the management of community assets is a fundamental aspect of the fiduciary duties owed between spouses." (*In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1269.)

Section 721, subdivision (b), provides in relevant part that "spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."

"From the date of separation to the date of the distribution of the community . . . , each party is subject to the standards provided in section 721, as to all activities that affect the assets and liabilities of the other party, including . . . [¶] . . . [¶] . . . [¶] (3) The operation or management of a business . . . in which the community may have an interest." (§ 2102, subd. (a).) "[E]ach party has a continuing duty to immediately, fully, and accurately update and augment that disclosure to the extent there have been any material changes so that . . . each

7

party will have a full and complete knowledge of the relevant underlying facts." (§ 2100, subd. (c).)

Section 1100 provides further that "[e]ach spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in [s]ection 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable . . . ." (§ 1100, subd. (e).)

To enforce these fiduciary duties, a petition for dissolution includes a restraining order prohibiting both parties the transfer or disposition of any property without consent or order of the family court, except those made in the usual course of business or for the necessities of life. (§ 2400, subd. (a)(2).) Violating the restraining order may result in statutory sanctions. (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1102–1103.)

Section 1101, subdivision (a), establishes a claim for damages for breach of a spouse's fiduciary duty: "A spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or

transactions have caused or will cause a detrimental impact to the claimant spouse's undivided one-half interest in the community estate."

Section 1101, subdivision (g) provides that "[r]emedies for breach of the fiduciary duty by one spouse, including those set out in sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and costs."

Subdivision (h) of section 1101 states: "Remedies for the breach of the fiduciary duty by one spouse, as set forth in sections 721 and 1100, when the breach falls within the ambit of section 3294 of the Civil Code shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, or an amount equal to 1000 percent, any asset undisclosed or transferred in breach of the fiduciary duty."

Section 3294 of the Civil Code, of course, is the statutory authorization for punitive damages, specifically "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice . . . ."

As should be obvious from the statutory language, fiduciary duties apply to assets that are, or might be, community assets. It does not apply to separate property. (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 278–279 (*Schleich*).)

### B.     The Relevant Family Court Determinations

The family court made numerous factual findings pertinent here that, with minor editorial changes, begin with the following three:

9

"(14) [DCCH] is a community asset and is awarded to [Lane] at a value of $2,089,748, the value nearest to the time of trial. The court finds that $2,200,000 paid to DCCH on April 14, 2017 is a DCCH asset, not a bonus, from which the court deducted appropriate business expenses.

"(15) [Crouch] breached his fiduciary duty under . . . 1101 as it relates to DCCH. [Crouch] singlehandedly impaired [Lane's] [one-half] interest by trying to destroy and/or dissipate it. Evidence was clear that DCCH was the main source of income and support for the family throughout the marriage. The court finds [Crouch] stopped working the DCCH business. He went to work for Zega; gave Zega his name, designs, and reputation, all of which were critical to the business. He essentially gave Zega his employees, trucks, and other assets. Zega used [Crouch] for his contractor's license and contacts. Zega got the benefit of [Crouch's] contacts. Zega essentially had the entire DCCH business.

"(16) [Crouch's] breach of fiduciary duty in regard to DCCH does not rise to the level of Family Code [section] 1101[, subdivision] (h) which would have mandated an award to [Lane] of 100 percent of the value of DCCH."

The family court subsequently augmented the following: Crouch's breach of fiduciary duty "as it related to DCCH is supported by sufficient evidence as (i) the value of DCCH had dissipated due to [Crouch's] breach given [Crouch's] expert testimony that the value dipped to a negative $78,805, (ii) the parties did not agree to 'wind down' DCCH as evidence by [Crouch's] own testimony at trial, (iii) [Crouch] gave everything of value at DCCH to Zega Builders, Inc."

10

"The court's finding as to the value of DCCH at the time nearest trial is supported by sufficient evidence in that

"(i) Family Code [section] 1101 allows the court to award the asset at a value according to the date the asset is awarded by the court.

"(ii) The court is not mandated to consider only the experts' opinion as to value and was able to value the business without additional expert testimony.

"(iii) The court had evidence which could have resulted in an even higher value of DCCH including considering the $2,200,000 as income in 2017 for work done in 2016 could have resulted in an even higher value of DCCH under the excess earnings approach used by Lucy Chung, or adding into the DCCH earnings the profits made by real estate sales not captured in the company's tax returns.

"(iv) [Crouch's] post-separation efforts were compensated by Zega Builder's Inc. through [Crouch's] receipt of W-2 income, including a $100,000 bonus in 2016 leaving the $2,200,000 as DCCH's, not [Crouch's].

"(v) [Crouch] had ample opportunity to present evidence regarding any tax liability at trial in regard to the $2,200,000 check and presented none.

"(vi) The tax consequences, if any, to DCCH are awarded to [Crouch] and need not be contemplated by the court in assessing its value; 'the trial court need not speculate on such possibilities, however, or consider tax consequences that may or may not arise after the division of the community property.' Weinberg v. Weinberg [(1967)] 67 Cal.2d 557 at [p.] 566, and

"(vii) The court's finding as to the value of DCCH is equitable as the court did not order reimbursement to the community for any funds [Crouch] withdrew from DCCH; nor personal expenses of [Crouch's] paid by DCCH from the date of separation to the date of the award of DCCH to [Crouch]."

## C.     Standards of Review

"The existence and scope of a fiduciary duty is a question of law that we review de novo. [Citation.] However, 'the factual background against which we [answer that question] is a function of a particular case's procedural posture.' [Citation.] Thus, to the extent the court's decision below 'turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard. [Citation.]' [Citation.] Where there is a fiduciary duty, breach of the duty is a question of fact. [Citation.] We review the trier of fact's finding a breach occurred for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the decision." (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144 (*Kamgar*).) "We review for abuse of discretion the trial court's decision concerning the appropriate remedy for breach of fiduciary duty." (*Id.* at p. 150.)

" 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination,

12

and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' " (*In re Marriage of Goodwin-Mitchell & Mitchell* (2019) 40 Cal.App.5th 232, 238–239.) " '[I]t is well established that the trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court.' " (*In re Marriage of Berman* (2017) 15 Cal.App.5th 914, 920.)

We recently reiterated that " ' "as with any challenge to the sufficiency of the evidence, it is the appellant's burden to set forth not just the facts in its favor, but all material evidence on the point. ' "Unless this is done the error is deemed to be waived." ' " [Citation.]' [Citation.]" (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 641–642.) This principle applies in family law appeals. (E.g., *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 (*Fink*); *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1530–1532.)

The family court "has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal." (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631–632 (*Duncan*).) And "A family court's discretion in dividing marital property includes

the authority to award a marital business to one spouse as a means to achieve equity in the division of property." (*In re Marriage of Gréaux & Mermin* (2014) 223 Cal.App.4th 1242, 1251.)

We review rulings on division of property and imposition of sanctions for abuse of discretion. (*Schleich, supra*, 8 Cal.App.5th 267, 276.)

## D. The Finding That Crouch Breached His Fiduciary Duty

Under the caption "David did not breach his fiduciary duty with respect to DCCH," Crouch puts forth several arguments. There are related issues that will be considered here for analytical coherence and convenience.

(1) Crouch acknowledges that under the plain language of section 721, subdivision (b), he owed Lane "a duty of the highest good faith and fair dealing," but he then appears to dilute that command by importing the less punctilious duties of a partner as defined in the Corporations Code, specifically section 16404 of the Uniform Partnership Act of 1994. Whatever impact Crouch may have intended is lost when he concedes that "Sections of the Corporations Code not specified in section 721 are not incorporated into the Family Code fiduciary duty."

Crouch then reasons: "DCCH was undisputedly community property. Thus, [Crouch] and [Lane] had equal interests in it. [Citations.] Both parties therefore had parallel fiduciary duties to each other with respect to DCCH until it was divided by the court. [¶] [Lane] stopped working at DCCH in or around June 2013. [Crouch] stopped over a year later, in July 2014. [Crouch's] fiduciary duties do not extend to the duty implicitly found by the court for him (but,

14

inconsistently, not for [Lane]) to carry on working at their community business, or to be responsible . . . for its loss of value, in the absence of gross negligence or intentional misconduct not present here."

This reasoning is completely at odds with the family court's findings. The court did not require either party to continue working for the business, but it implicitly did assume that if either did it would not be with the intent of actually harming the business. Crouch did not wind up the business or attempt a bona fide sale. Crouch and Lane might, in the abstract, have had reciprocal "fiduciary duties," but they could hardly be called "parallel," if for no other reason than Crouch had greater knowledge of the business as well as actual possession and control of its physical assets. Because Crouch was in charge of DCCH, it was he who "singlehandedly" tried to "dissipate or destroy" Lane's interest in the business. That amounts to "gross negligence or intentional misconduct" in anybody's book.

(2)  Crouch next argues that he "did not breach his fiduciary duty by going to work for Zega," "by taking steps to wind down DCCH's activities in 2012 based on his desire to change his work." He believes that the family court "did *not* find that [he] stopped working at DCCH and went to work for Zega for any bad-faith reason such as in order to deprive [Lane] of funds, or that his conduct was grossly negligent, reckless, intentional misconduct, or in violation of law."

This is not only hair-splitting, it is simply wrong. The family court *did* expressly find that Crouch's conduct was "in violation of law," namely, the Family Code statutes codifying the obligations of spousal fiduciary duty. A finding of breached fiduciary duty would certainly

15

cover much of the same ground as a finding of bad faith.[3]  The word "destroy" imparts a mental intent that excludes the possibility of negligent, or even reckless, conduct.  There can be no dispute that attempting or actually destroying a community asset is contrary to the statutory duties discussed above, particularly section 1101, subdivision (e) and section 2100, subdivision (c).

As for Crouch being motivated by a simple "desire to change his work," the record is clearly otherwise:  Crouch stayed in the construction business, in the same area, and continued on an almost full-time basis, but with the new intent.  Recalling that Zega did not even have a contractor's license, one is tempted to conclude that Zega was just as much an alter ego of Crouch as was DCCH.

As for "winding down" DCCH, the family court found that "the parties did not agree to 'wind down' DCCH," which is the equivalent of finding that Crouch unilaterally tried to "wind down" the business in a way that would be maximally disadvantageous to Lane.

There follows six pages in Crouch's brief narrating events—from Crouch's perspective—culminating with the following:  "The evidence falls far short of establishing gross negligence or intentional misconduct.  The lower court's conclusion that [Crouch] breached his fiduciary duty by going to work for Zega radically expands the scope of a party's fiduciary duty with respect to operating a business.  Finding a

---

[3]   Breach of fiduciary duty has commonly been equated with fraud.  (E.g., *Flores v. Arroyo* (1961) 56 Cal.2d 492, 494–495; *In re Marriage of Coffin* (1976) 63 Cal.App.3d 139, 154–155; *Baker v. Baker* (1968) 260 Cal.App.2d 583, 586.)

16

breach on these facts was a misunderstanding of law and therefore an abuse of the court's discretion."

Crouch does not expressly mount a direct attack on the sufficiency of the evidence to support the family court's crucial finding that he breached his fiduciary duty to Lane "by trying to destroy" the business. However, such an attack is unquestionably the predicate for Crouch's argument. Only by accepting his exculpatory version of events can Crouch launch his legal arguments: "Finding a breach *on these facts* was a misunderstanding of law and therefore an abuse of the court's discretion."

Yet accepting this alternative narrative would entail disregarding a number of fundamental principles of appellate review, namely: (1) that the judgment is presumed correct until the appellant proves otherwise (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609); (2) that the reviewing court will presume that all factual findings made by the trier of fact are supported by the evidence (*Fink, supra,* 25 Cal.3d 877, 887); (3) that " 'an appellant who contends this some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error . . . is deemed to be waived' " (*ibid.*); and, as already mentioned, (4) that the reviewing court will credit all inferences and deductions that favor the trier of fact's finding or conclusion. (*In re Marriage of Goodwin-Mitchell & Mitchell, supra,* 40 Cal.App.5th 232, 239.) Clearly, these principles will not permit an appellant to present a highly selective recitation of the record that ignores contrary evidence and deductions that are supportive of the finding and the judgment. And, we reiterate, the existence of a breach of fiduciary duty is a

17

question of fact. (*Kamgar*, *supra*, 18 Cal.App.5th 136, 144; *Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 915.)

Accordingly, we must reject Crouch's conclusory assessment that "The evidence falls far short of establishing gross negligence or intentional misconduct."[4] This means we also must reject Crouch's argument that the family court's "conclusion . . . radically expands the scope of a party's fiduciary duty with respect to operating a business" because it ignores the evidence that Crouch was not merely trying to "operate a business," but intended to "destroy" Lane's community property interest in the business. It also follows that Crouch has no basis for asserting that the family court "misunderstood" the law and abused its discretion.

(3) Crouch next moves to the matter of taxes. He contends that "the fiduciary breach found by the court with respect to [his] management of DCCH does not permit the court to assign the entire tax burden to him without offset." Crouch reasons that "If a spouse's conduct benefits the community, related liability is community as well, and cannot be characterized as solely one party's separate debt. [Citation.] The community manifestly *gained* by [Crouch's] conduct which gave rise to the tax liability, in that the community received 100 percent of the benefit of the bonus earned by [Crouch] while working for Zega, constituting a huge increase in the value of DCCH." This reasoning is unavailing.

---

[4] By contrast, Lane spends more than 30 pages in her brief detailing the evidence establishing Crouch's "Breaches of Fiduciary Duty with Respect to DCCH."

18

First, the family court expressly rejected the characterization of the $2.2 million payment Crouch received from Zega was a "bonus."

Second, what Crouch characteries as "gain" to the community was called attempted destruction of a community asset by the family court. As for "gain," the word seems inappropriate in the context of Crouch's foiled plan to transmute community property into his separate property.

Third, and most decisive, was the family court's conclusion that Crouch "had ample opportunity to present evidence regarding any tax liability at trial in regard to the $2,200,000 check and presented none." Crouch points to nothing in his brief to impeach the court's conclusion.[5] He does not even claim that he made an offer of proof.

In these circumstances, the word "speculative" is more than apposite to describe the subject of tax liability.

---

[5] Indeed, in her brief Lane drives the point even deeper: "Nor did [Crouch] make any attempt to demonstrate any specific tax liability during the *six months* between the court's July 28, 2017 oral ruling assigning the DCCH business to [Crouch] . . . and its January 19, 2018 written tentative decision. [¶] . . . [¶] The first time [Crouch] presented any figure depicting purported tax liability was on February 15, 2018, in his objections to the tentative decision. Without further explanation or any evidentiary support, he simply stated he 'estimates that the corresponding total 2017 tax liability for the DCCH revenue awarded to [him] in the amount of $2,172,940 is $1,054,547.' . . . Using identical language, [Crouch] repeated his $1,054,547 'estimate' in his points and authorities accompanying his motion for new trial. These two unsworn documents are the only places in the record that the $1,054,547 figure is mentioned. [¶] Indeed, nowhere in the record is there any explanation for how the $1,054,547 figure was derived, who calculated it, or whether they were competent to make tax calculations."

Instead, Crouch argues "the issue was not forfeited" because he "appropriately preserved this issue for review by raising it at the first available opportunity." But "the issue" is not whether the issue of the "tax burden" was preserved for review, but whether Crouch can demonstrate from the record that he *did* present evidence on the issue, and that that evidence was, as Lane notes, sufficient to discharge *his* "burden to prove that the division of community property would result in his claimed $1,054,547 tax liability." He does not.

(4) The family court found that Crouch's breach of fiduciary duty "as it related to DCCH is supported by sufficient evidence as (i) the value of DCCH had dissipated due to [Crouch's] breach given [Crouch's] expert testimony that the value dipped to a negative $78,805, (ii) the parties did not agree to 'wind down' DCCH as evidenced by [Crouch's] own testimony at trial, (iii) [Crouch] gave everything of value at DCCH to Zega Builders, Inc." Crouch contends "the negative fluctuation in DCCH's value" does not demonstrate a breach of his fiduciary duties. "Fluctuation" is hardly the right description—"attempted destruction" is better.[6] For the clear import of the family court's findings is that Crouch did his best to destroy the value of DCCH, a seemingly profitable enterprise, and the primary community asset. The "fluctuation" to a negative value for the business showed how close he came to achieving that goal. The nosedive of DCCH's worth *was* attributable to Crouch's breach of fiduciary duty not to harm the "operation or management of a business . . . in which the community [has] an interest." (§ 2102, subd. (a)(3).)

---

[6] The word used by Lane's counsel was "sabotage."

20

(5)  Crouch then gives the "fluctuation" argument a unique spin: "The court abused its discretion by failing to apportion the value of DCCH between the community and [Crouch] given his post-separation efforts."  He reasons that DCCH was worth no more than $638,000 when he and Lane separated.  And he goes on, measured by the "bonus" Zega gave him, DCCH's value increased to $2.2 million, an increase that was due to his efforts and for which he should be compensated.

The illogic of this reasoning is stunning.  Crouch is in effect admitting that he kept control of the DCCH assets he supposedly sold to Zega.  This is not only contrary to his position at trial, it is itself an independent violation of his fiduciary duties, specifically, each and every one of the obligations enumerated in subdivision (a) of section 2102.[7]  It is no surprise that Crouch does not point to any evidence in the record showing that he even attempted to comply with those

---

[7]  "(a) From the date of separation to the date of distribution . . . , each party is subject to the standards provided in Section 721, as to all activities that affect the assets . . . of the other party, including, but not limited to, the following activities:

"(1)  The accurate and complete disclosure of all assets . . . .

"(2)  The accurate and complete written disclosure of any investment opportunity, business opportunity, or other income-producing opportunity that presents itself after the date of separation . . . .

"(3)  The operation or management of a business or an interest in a business in which the community may have an interest."

Moreover, section 721 provides that among a spouse's pre-distribution duties is the responsibility for "[a]ccounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse that concerns the community property." (§ 721, subd. (b)(3).)

21

obligations. Even more fundamentally, Crouch is arguing that he should be allowed to profit from breaching his fiduciary duties.

Crouch cites *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, for the proposition that "Apportionment is required when 'more than minimal' effort is devoted to the business." *Dekker* is clearly distinguishable because Crouch's post-separation efforts were patently less than minimal. Indeed, the family court found that Crouch did more than try to put DCCH into hibernation, he tried to "dissipate" if not "destroy" it.

(6) Citing the principle that "[p]icking one year's net income, where income rises or falls from year to year, is not a reasonable basis for determining value" (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 821), Crouch tells us the family court "erred in in valuing DCCH at $2,089,748 based on a one-time bonus paid for [Crouch's] post-separation efforts." We do not agree.

As previously shown, the family court refused to accept Crouch's characterization of the $2.2 million payment he received from Zega was a "bonus." The court did not specially explain the reasoning behind that refusal, but the logic is easy to discern.

"The Court finds the $2,200,000 paid to DCCH . . . is a DCCH asset, not a bonus . . . . [¶] The Court finds [Crouch] stopped working the DCCH business. He went to work for Zega, gave Zega his name, designs, and reputation[,] all of which were critical to the business [DCCH]. He essentially gave Zega his employees, trucks, and other assets. Zega used [Crouch] for his contractor's license and contacts. Zega got the benefit of [Crouch's] contacts. Zega essentially had the entire DCCH business."

The relevant point of the *Rosen* decision is that a family court is better advised to find an annual average for a community asset's value instead of picking a single, atypical, year, which risks producing an inflated figure. (*In re Marriage of Rosen*, *supra*, 105 Cal.App.4th 808, 818–821.) As a general rule, for most situations, it is sound. But the family court was looking at an unusual situation, one where averaging was not feasible.

The clear import of the family court's findings is that Crouch caused DCCH to de facto go out of business. It may have retained a legal identity, but as a functioning business, DCCH had ceased to exist. There is no indication that it was generating income during the years it was effectively merged with Zega. As such, there was nothing to average. The family court had only the opposing experts' opinions of the value of DCCH about the time of the parties' separation in July 2013 (Crouch's expert—$92,699; Lane's expert—$638,000). So, when it came time for the family court to decide the issue in 2018, it was entirely reasonable for the court to conclude that in these circumstances averaging was not feasible. Averaging might have been possible had the experts been able to factor in the $2.2 million "bonus," but the peculiar timing of its disclosure made that impractical.

It should also be remembered that, having found that Crouch had breached his fiduciary duties to Lane, the family court was operating in the context of section 1101, which obliged the court to select "the highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (§ 1101, subd. (g).)

As already shown, whether there is a fiduciary duty is an issue of law, whether it has been breached is an issue of fact. (*Kamgar*, *supra*, 18 Cal.App.5th 136, 144.) The Family Code statutes already quoted leave no possibility for dispute that spouses have myriad fiduciary duties with respect to each other, and to property, up to the moment the marital estate is divided. These duties are established by law. Crouch has failed to demonstrate that the family court's findings as to Crouch's manifold breaches of those duties are factually inadequate. Insofar as the findings affect divisions of property, or constitute the imposition of sanctions, Crouch has also failed to establish the abuse of discretion needed for reversal. (*Schleich*, *supra*, 8 Cal.App.5th 267, 276; *Duncan*, *supra*, 90 Cal.App.4th 617, 631–632.)

## E. The Value Of The Business

As previously shown, fixing the value of an asset in the marital estate is a factual issue entrusted to the family court's discretion. (*Duncan*, *supra*, 90 Cal.App.4th 617, 631–632.) The family court set the assets of DCCH at the trial at $2.2 million, the amount of payment made by Zega. After deducting "appropriate business expenses" the court fixed the value of DCCH at $2,089,748. Crouch desires that we overturn this determination. We will not do so.

(1) The major thrust of Crouch's contention is that the $2.2 million was simply a "bonus" compensating him for his work and efforts for Zega. The family court having concluded that the payment was in truth "a DCCH asset, not a bonus," Crouch is challenging a finding of fact, which means in plain effect that he is arguing it is not supported by substantial evidence. (See, e.g., *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 ["The valuation of a particular asset is a factual

24

question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence"].)

We reject Crouch's contention for two reasons, First, it is deemed waived because he failed to set out all the relevant evidence in his brief. (*Fink, supra*, 25 Cal.3d 877, 887.) Second, Crouch examines this issue in isolation, refusing to recognize that it cannot be removed from its context, which is, as found by the family court, the persuasive evidence of Crouch's pervasive scheme to violate his numerous fiduciary duties to Lane.

(2) Turning to the family's court augmentation (see fn. 2, *ante*), Crouch asserts that "the court's explanation of the evidence supporting its valuation of DCCH does not cure its abuse of discretion." Crouch does not identify precisely what the court did that involved the exercise of discretion. Insofar as he may think the discretion involved was deciding whether to treat the Zega payment as his separate property or the property of DCCH, abuse of that discretion would require Crouch to demonstrate there is no substantial evidence to support the court's decision to reject his claim that the $2.2 million payment was a bonus. (*Duncan, supra*, 90 Cal.App.4th 617, 631–632.) Again, this assumes we pay no attention to his widespread breaches of his fiduciary duties.

(3) Crouch next focuses on parts of the family court's augmentation of finding 15, reasoning as follows: First, "(ii) The Court is not mandated to consider only the experts' opinion as to value and was able to value the business without additional expert testimony." Crouch makes this excerpt his caption for the following: "[Crouch] does not dispute that in appropriate circumstances the court may consider more than experts' opinions; however, in this case the court erred in its

25

approach, for all the reasons set forth above." If those reasons are Crouch's prior efforts to examine items without regard for the fiduciary issue, they have already been rejected, and cannot be reanimated with such cursory explanation.

(4) Next for Crouch is "(iii) The court had evidence which could have resulted in an even higher value of DCCH including considering the $2,200,000 as income in 2017 for work done in 2016 could have resulted in an even higher value of DCCH under the excess earnings approach[] used by Lucy Chung, or adding into the DCCH earnings the profits made by real estate sales not captured in the company's tax returns." To which Crouch reasons: "The court's speculation that it *could* have considered or even adopted other evidence which arguably could have resulted in a higher valuation by another expert does *not* establish that the court's actual approach was reasonable or within the range of evidence presented on valuation. Further, even if the $2,200,000 income were considered in 2017 under a different methodology, that would not remove the necessity of considering the accompanying tax burden."

Initially, we do not view the family court in indulging in speculation. Quite the contrary: the court was clearly signaling that it had concluded there was "*evidence* which could have resulted in an even higher value of DCCH." (Emphasis added.) Beyond that, the valuation accepted by the court was eminently reasonable because the court could conclude this was the valuation on the entirety of Crouch's post-separation transaction with Friedman/Zega that was fixed by Friedman and Crouch. In effect, the family court simply accepted Crouch's own valuation of DCCH. He will not be heard now to call that

26

decision unreasonable.  (Cf. Evid. Code, § 813, subd. (a)(2) ["The value of property may be shown only by the opinion of . . .  [¶] . . . [¶]  The owner . . . of the property or property interest being valued"].)

(5)  Crouch then looks to this part of the family court's reasoning: "[Crouch's] post-separation efforts were compensated by Zega Builder's Inc. through [Crouch's] receipt of W-2 income, including a $100,000 bonus in 2016 leaving the $2,200,000 as DCCH's, not [Crouch's]."

Crouch argues that even his "receipt of earned income from Zega does not relieve the court's obligation to allocate the value of DCCH between separate and community interests, given [Crouch's] substantial post-separation efforts.  The court failed to meet its duty 'to quantify the contributions of the separate capital and community effort to the increase' [citation.]  Instead, the court awarded 100 percent of the value of DCCH, including all of the post-separation increase, to the community, on the theory that [Crouch] was adequately compensated by his income from a third party, Zega."  "[T]he court here was obligated to determine to what extent the increased value of DCCH was attributable to [Crouch's] post-separation effort versus the capital value of DCCH as of the date of separation, and then allocate the increase accordingly.  [¶]  Given that DCCH was propelled by the efforts of [Crouch] alone, the court should have determined the value of DCCH as of the date of separation and attributed to the community that amount plus a fair return, allocating the rest to [Crouch]."

This is revisionist reasoning.  The idea of allocating value to DCCH as of the time of separation was considered by the parties' experts, but rejected by the family court—which Crouch has already conceded was within the court's discretion to do so.  Given Crouch's

27

pervasive breach of his fiduciary duties, the court found that "the value of DCCH had dissipated due to [Crouch's] breach." It is therefore more than surprising to see Crouch as treating DCCH as having a value and viability that Crouch did his best to, again as the court found, "dissipate" if not "destroy." As for Crouch's own interest in DCCH, he virtually handed it to Friedman/Zega. Crouch went from being the owner of DCCH to a salaried employee of Zega. There was no evidence that the assets and goodwill Crouch brought with him to Zega produced a single dollar of income to DCCH. It has already been shown that the figure of $2.2 million was presumably fixed by Friedman and Crouch as the value of DCCH at the time it was returned to Crouch in the form of a "bonus."

Finally, as previously noted, the family court was making its decision in the context of section 1101, subdivision (g), which statute obligated the court to value the asset at the *highest* of three possible dates—"the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." The $2.2 million payment was the event closest in time to "the date of the award," so it was natural that it was selected for fixing the value of DCCH. In these circumstances, and given the family court's discretion on this matter (*Duncan*, *supra*, 90 Cal.App.4th 617, 631–632), it cannot be said that the court's decision exceeded the bounds of reason.

(6) Crouch's next target is the finding that "[Crouch] had ample opportunity to present evidence regarding any tax liability at trial in regard to the $2,200,000 check and presented none." Concerning this, he states only "This point is rebutted in section IV(B)(1)(c) above." No, it isn't. (See section D. (3), *ante*.)

28

(7)  The family court concluded:  "The tax consequences, if any, to DCCH are awarded to [Crouch] and need not be contemplated by the court in assessing its value; 'the trial court need not speculate on such possibilities, however, or consider tax consequences that may or may not arise after the division of the community property.' *Weinberg v. Weinberg* (1967) 67 Cal.2d [557] at [p.] 566."  Crouch asserts that "This point is rebutted in section IV(B)(1)(a) and (b) above."  No, it isn't.  (See section D. (3), *ante*.)

(8)  The family court stated that the "finding as to the value of DCCH is equitable as the court did not order reimbursement to the community for any funds [Crouch] withdrew from DCCH; nor personal expenses of [Crouch's] paid by DCCH from the date of separation to the date of the award of DCCH to [Crouch]."  This is just another way for Crouch to argue that he was denied "the fruit of his years of post-separation labor," a subject already addressed.  Moreover, it is hard to understand why Crouch sees himself harmed by language which declines to order him to make "reimbursement to the community."

It should be kept in mind that this was just one of six reasons cited by the Family Court as supporting its decision how to fix a value for DCCH, and those six reasons were augmentation to what the court had already said in paragraph 15 of its original Final Orders.  Thus, even if this particular argument had merit, it would lack the potency to require overturning the valuation fixed by the family court—a valuation, not incidentally, that is but a single aspect of Crouch's breaching his fiduciary duties.

(9)  Lastly, under the heading of the timing of the bonus, "The court noted that he bonus was 'very delayed' and stated that 'DCCH

29

clearly could and should have earned [it] earlier,' but did not explicitly premise its order on that basis. Regardless, no evidence supports the court's finding that DCCH 'could and should have earned earlier' the bonus [Crouch] was paid for his work on 5 Carolina." Indeed, the suspiciousness of the timing of $2.2 million payment to Crouch is close to *res ipsa loquitur*.[8]

With Crouch conceding that the family court "did not explicitly premise its order on that basis," he is tacitly admitting he is attacking dictum. Moreover, the court's words were in the form of remarks made at a hearing, not actual language from the judgment. (See fn. 2, *ante*.) It is well-settled that oral remarks or comments made by a trial court may not be used to attack subsequently-entered findings, order, or judgment. (*Farwell v. Sunset Mesa Property Owners Assn., Inc*. (2008) 163 Cal.App.4th 1545, 1552–1553; *Jie v. Liang Tai Knitwear Co*. (2001) 89 Cal.App.4th 654, 667, fn. 9.)

In sum, Crouch's fundamental argument on appeal, that directed toward the business, has no merit. Likewise his arguments directed to the two other rulings, those involving (1) 1425 Bay Laurel and (2) Cunitz and Tang-Greenbaum.

---

[8] The circumstances bring to mind the stratagem used in *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, which involved to failure to disclose a winning lottery ticket. The ticket was purchased by a workplace group that included the wife. The husband did not learn of the windfall until after the marriage was dissolved. The Court of Appeal affirmed the trial court rejecting the former wife's claim that "the lottery winnings [were] her separate property because the share she received was a gift" from the other members of the pool. (*Id* at pp. 39, 41.)

30

## F. Crouch's Other Two Arguments Have No Merit
### Introduction

As indicated above, throughout his brief, Crouch places considerable stress on the repeated references to the statutory directive that the family court "shall . . . divide the community estate of the parties equally." (§ 2550.) This is the ordinary approach and goal, but it is not an inflexible command. The Family Code has several provisions that allow deviation, including these two:

"As an additional award or offset . . . the court may award from a party's share the amount the court determines to have been deliberately misappropriated by the party to the exclusion of the interest of the other party in the community estate." (§ 2602.)

"If a party fails to comply with any provision of this chapter [(Fam. Code, § 2100 et seq.)], the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party. Sanctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (§ 2107, subd. (c).)

As also indicated above—and indeed, addressed in detail in connection with Lane's appeal—section 1101 sets out remedies for breaches of spousal fiduciary duties, particularly subdivisions (g) and (h) quoted above. And the family court expressly found that Crouch "breached his fiduciary duty under Family Code 1101 as it relates to DCCH," which led to two other issues Couch raises on appeal—issues to which we now turn.

31

**1425 Bay Laurel**

Prior to the time Lane and Crouch separated, DCCH entered into a joint venture with a Mr. Triant to demolish and rebuild the residence at 1425 Bay Laurel, which Triant owned. DCCH agreed to provide a nominal sum ($1,960) and "certain services" to the project. When the project was "completed," DCCH's 49 percent ownership interest would vest.

In September 2013, after Lane and Crouch separated, and before the project was completed, the joint venture agreed to sell it for $5.5 million. Contemporaneously, and before the sale was complete, DCCH and Triant made a supplemental agreement that DCCH would finish the project for $500,000. Crouch did not advise Lane of any of these agreements.

Shortly before the escrow on the sale closed, DCCH and Triant executed yet another side agreement, which in essence changed the procedure for DCCH's 49 percent ownership percentage to vest. Approximately a week later, DCCH received a check for $377,287.39, which was deposited into Lane's and Crouch joint account.[9] Thereafter, in accordance with an agreement between DCCH and the buyer to complete the Bay Laurel property, DCCH received two post-separation payments, totaling $500,000.

The family court found as follows:

---

[9]  According to Lane: "In the fall of 2014, by stipulation, $300,000 of the $377,287 was divided equally between [Lane] and [Crouch], leaving an undistributed balance of $77,287."

"The community shall be reimbursed $304,107[10] from [Crouch] for the sale of 1425 Bay Laurel, Menlo Park, CA. The court finds this property sold three months after separation, and accepts [Lane's] rendition of the undistributed funds. The court denies [Crouch's] separate property claim for reimbursement with regard to 1425 Bay Laurel."

"The community [interest] of the portion of the post-sale construction contract to DCCH for 1425 Bay Laurel was supported by sufficient evidence as (a) [Crouch] was 49 percent vested in the 1425 Bay Laurel partnership, (b) [Crouch] unilaterally controlled the $500,000 payment to DCCH as payment for construction as opposed to a portion of the purchase price of the home, (c) DCCH invoicing lagged behind actual work done, and (d) [Crouch] was compensated for post-separation work on 1425 Bay Laurel by his draws from DCCH and payment of his personal expenses by DCCH."

Crouch argues that the family court erred in treating all profit from the project as a community asset, "without allocating to [him] any portion at all for his post-separation efforts from July 2013 until sometime after December 2014 in creating that profit." His position is straightforward: "From and after separation in July 2013, [he] was entitled to receive his separate property interest from working on that property." Crouch fails to establish error.

---

[10] Again, according to Lane: "This figure represented the $77,287 of earlier proceeds from the sale of the project that had not yet been distributed to the parties, plus the $500,000 that DCCH received from the owners post-sale, minus $273,180 for [Crouch's] construction costs."

Although the family court did not make an express finding that Crouch breached his fiduciary duties with respect to this project, the finding (¶ 15) quoted above is broad enough to cover 1425 Bay Laurel. The language used by the court about how Crouch "unilaterally controlled the $500,000 payment," and the tenor of the other "substantial evidence" cited, is compatible with the implicit conclusion that Crouch was acting in his own interest, not the community's. The matter of DCCH's vested percentage could, and apparently was, treated by the family court as a ploy to reduce the amount that might be treated as a community asset. In other words, 1425 Bay Laurel was another instance where Crouch breached his fiduciary duties by manipulating the timing, classification, and destination of cash monies.

What Crouch terms "his separate property interest from working on that property" overlooks the undisputed fact that DCCH's involvement with 1425 Bay Laurel began *prior* to Crouch and Lane separating. It was therefore, at least presumptively, a community asset.

There is a natural appeal to Crouch's claim that his post-separation work bring the project to completion should not go uncompensated. But it does not address the family court's finding that Crouch "*was* compensated for post-separation work on 1425 Bay Laurel by his draws from DCCH and payment of his personal expenses by DCCH" (emphasis added). Crouch does not make an effective reply to the following sentences in Lane's brief that devastate the foundation of Crouch's argument: "[Crouch's] own QuickBooks records, as analyzed by [Lane's] forensic accountant . . . showed that during the entirety of the $500,000 construction project, DCCH incurred only a minimal

34

amount—$173.61—in job-related costs.  This would seem to belie [Crouch's] testimony that DCCH had three to four months of work left to perform under the $500,000 contract.  The QuickBooks report would have shown labor or subcontractor expenses if there had been any, and *there were none*.  [¶] . . .  The evidence suggested that the construction was substantially complete prior to sale, and that the $500,000 component of the transaction was only there to provide tax benefits to the buyers. . . .  [Who] moved into the home shortly after the sale, so it certainly was in livable condition."  (Emphasis added.)  In short, there was a substantial basis for the family court to conclude that the $500,000 figure was not a genuine reflection of the amount of remaining work DCCH was expected to provide.

Were all this not enough, Crouch makes no genuine effort to demonstrate that the 30 volumes of reporter's transcripts are completely bereft of evidence upon which the family court could rely to make this finding by setting out *all* the relevant evidence on the challenged point.  (See *Fink*, *supra*, 25 Cal.3d 877, 887; *In re Marriage of Davenport*, *supra*, 194 Cal.App.4th 1507, 1530–1532.)

### Cunitz and Tang-Greenbaum

The family court directed that "[Crouch] shall reimburse the community $134,097 for the funds diverted to Australia in the Cunitz and Tang-Greenbaum transactions."  The court had already found that "the real property at 98 Longbrush, Kiama, Australia"—which had been purchased with those funds—"is characterized as community property and is awarded to [Lane] at a value of $1,492,000 (US) reduced by any debt thereon."

Crouch charges this was error because "when [the] payments were made from a community source (the funds two clients named Cunitz and Tang-Greenbaum owed to DCCH, a community business) to acquire a community asset, the Longbrush property, that created no characterization or allocation issue. The court double-dipped by charging [Crouch] for them because the community has already received the benefit of the payments."

The family court did not exactly disagree with this argument, but trumped it with an overriding legal decision: "There is no double dipping by the community in the award of the reimbursement of the Tang-Greenbaum transaction as the funds were unilaterally diverted by [Crouch] to the purchase of Longbrush such that the remedy of reimbursing the community is appropriate under Family Code [section] 1101[, subdivision] (g)."[11]

As has already been discussed, invocation of subdivision (h) of section 1101 is the nuclear option of family law. In cases where the breach of fiduciary duty is sufficiently egregious as to come "within the ambit of section 3294 of the Civil Code"—that is, the threshold for punitive damages because of clear and convincing evidence of oppression, fraud, or malice—the court is authorized to award the victim spouse "an amount equal to 100 percent[] of any asset . . . transferred in breach of the fiduciary duty." Thus, the family court considered that Crouch's conduct went so far beyond run-of-the-mill

---

[11] Although the family court mentioned only the Tang-Greenbaum payments, the parties appear to assume that the Cunitz payments are also included in the court's conclusion and covered by its reasoning. We, too, proceed on that assumption.

breach of fiduciary duty as to warrant what amounts for forfeiting the entirety of his interest in the Longbrush property.

We recently stated: " ' "Whether to award punitive damages and how much to award were issues for the jury and for the trial court on the new trial motion. All presumptions favor the correctness of the verdict and judgment." [Citation.] We review the evidence supporting awards of punitive damages for substantial evidence. "As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light *most favorable to the prevailing party*, giving him the benefit of *every reasonable inference*, and *resolving conflicts* in support of the judgment.' " [Citation.] We are mindful that in light of the heightened burden of proof under Civil Code section 3294, subdivision (a) "we must review the record in support of these findings in light of that burden. In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence.' " [Citations.] "However, as with any challenge to the sufficiency of the evidence, it is the appellant's burden to set forth not just the facts in its favor, but all material evidence on the point. ' "Unless this is done the error is deemed to be waived." ' " [Citation.]' [Citation.]" (*Pilliod v. Monsanto Co.*, *supra*, 67 Cal.App.5th 591, 641–642.)

As he does with several other of his arguments, Crouch makes no attempt to satisfy these requirements. The briefest comparison of Crouch's brief with that filed by Lane makes this obvious beyond any doubt. In fairness to the family court, and to keep the historical record clear, we set forth—with nonsubstantive modifications we have added—the precis of evidence in Lane's brief:

37

"[Crouch] wanted the family to move to Australia, but [Lane] did not. In March 2007, without [Lane's] consent, [Crouch] used community funds to purchase . . . Longbrush . . . in [his] hometown in Australia, taking title in his name only. The purchase price for Longbrush was $2 million Australian (approximately $1,580,000 U.S. dollars), funded with a $400,000 Australian down payment and a $1.6 million Australian mortgage from Commonwealth Bank. [Crouch] also spent community funds on the maintenance of Longbrush."

"On February 26, 2007, at [Crouch's] instruction, DCCH client Herb Cunitz transferred $22,819.66 Australian ($18,055 U.S.) that he owed to DCCH to an escrow account in Australia. On March 1, 2007, also at [Crouch's] instruction, Cunitz transferred $85,240 Australian ($67,144 U.S.) that Cunitz owed to DCCH to [Crouch's] IMB bank account in Australia. [Crouch] testified that he applied the Cunitz funds towards the down payment for Longbrush, the home in Australia that he purchased in March 2007.

"On February 15, 2011, four years after Longbrush was acquired, the Tang-Greenbaum family, a DCCH client, transferred $48,951.80 Australian ($48,895 U.S.) that they owed to DCCH to [Crouch's] mother's bank account in Australia. [Crouch] did not tell [Lane] about this transfer. [¶] At trial, [Crouch] claimed that his mother had loaned the community a total of $270,614.66 Australian from February 26, 2007 to April 28, 2011 towards the purchase and upkeep of Longbrush, including approximately $122,000 Australian towards the down payment. According to [Crouch], the Tang-Greenbaum transfer came about because his mother had supposedly pushed him to repay the money she had lent the community for the Longbrush mortgage, so he

38

had the Tang-Greenbaum family send funds to his mother's account in partial repayment of the loan.

"Just two days after the Tang-Greenbaum transfer, however, [Crouch's] mother transferred $48,951.80 Australian to [Crouch's] Commonwealth Bank account in Australia. According to [Crouch], his mother (who did not testify at trial) had purportedly reconsidered asking for repayment.

"Years later, in 2009 or 2010, [Crouch] and his mother created and signed what purported to be a February 26, 2007 balloon note to document a $122,819.66 Australian loan to [Crouch] from his mother. At the same time that [Crouch] created the February 2007 balloon note, he and his mother signed blank balloon notes to be filled in later by [Crouch]. During discovery, [Crouch] produced a document purporting to be a balloon note for a February 17, 2011 loan from his mother to [Crouch] in the amount of $48,951.80 Australian."

"[Thus], [Crouch's] representation that he 'directed certain payments from . . . Tang-Greenbaum towards the acquisition of Longbrush' is plainly wrong. The Tang-Greenbaum transfer took place four years after Longbrush was purchased. . . . Years later, [Crouch] tried to create loan "documentation," including purported loan agreements signed in blank by his mother. The court rejected [Crouch's] claims regarding his mother's Longbrush 'loans,' holding it was not a community debt and that the supposed loans 'were not what they were purported to be.' "[12]

_____

[12]   Lane also adds this about Crouch's "double dipping" claim: "[A]s to both Cunitz and Tang-Greenbaum, the 'asset . . . transferred in breach of the fiduciary duty' was not Longbrush at all (which was divided 50/50 as community property), but rather was entirely different

39

As already shown, it was for the trier of fact—in this case the family court itself—to decide whether the evidence made out oppression, fraud, or malice.[13]  At a minimum, the evidence was more than sufficient for the family court to conclude that Crouch committed fraud and/or acted with malice. As for then concluding that a sanction

property—client payments owed to DCCH, to which [Lane] was statutorily entitled to 'an award . . . of 50 percent, or an amount equal to 50 percent, of . . . ,' independent of her community property interest in Longbrush. (Fam. Code, § 1101, subd. (g).)  No 'double dip' occurred here.  . . . [¶] . . .[¶]  Here, the [judgment] comported with the mandatory language of subdivision (g) and penalized [Crouch] for having 'unilaterally diverted' funds owed by DCCH clients (and having done so in a manner difficult to detect)."

[13]  If a jury had been empaneled, it would have been instructed with CACI No. 3948 as follows:

"You may award punitive damages against [*name of individual defendant*] only if [*name of plaintiff*] proves by clear and convincing evidence that [*name of individual defendant*] engaged in that conduct with malice, oppression, or fraud.

" 'Malice' " means that a defendant acted with intent to cause injury or that a defendant's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another.  A defendant acts with knowing disregard when the defendant is aware of the probable dangerous consequences of the defendant's conduct and deliberately fails to avoid those consequences.

" 'Oppression' means that a defendant's conduct was despicable and subjected [*name of plaintiff*] to cruel and unjust hardship in knowing disregard of [his/her/*nonbinary pronoun*] rights.

" 'Despicable conduct'  is conduct that is so vile, base, or contemptible that it would be looked down on and despised by reasonable people.

" 'Fraud' means that a defendant intentionally misrepresented or concealed a material fact and did so intending to harm [*name of plaintiff*]."

was appropriate under section 1101 (and/or section 2602), we conclude there was no abuse of the discretion vested in the family to compensate Lane for Crouch's breach of his fiduciary duties. (*Schleich*, *supra*, 8 Cal.App.5th 267, 276.) For each, and all, of the reasons set forth above, we conclude that Crouch's attacks on the rulings made by the family court have no merit. And we turn to Lane's appeal, to conclude that it also has no merit.

### Lane's Appeal Has No Merit

We have discussed above Crouch's violations of section 1101, and their effect on him. Lane believes the family court was required to go farther. The sole contention in her brief is captioned "The Trial Court's Findings Mandate Family Code Section 1101, subdivision (h), Remedies." She reasons that by reason of Crouch's fiduciary breaches both expressly and implicitly found by the family court, "these findings bring [Crouch's] breaches squarely 'within the ambit of Section 3294 of the Civil Code' and require Family Code section 1101, subdivision (h), remedies," and "the 100 percent remedy is mandatory when conduct meets subdivision (h) standards." And, she adds, unlike "an ordinary civil case" where a party is never entitled to punitive damages, "subdivision (h) borrows Civil Code section 3294's definitions of whether an award is *permissible* and makes the minimum 100 percent remedy *mandatory* and nondiscretionary if that threshold is met."

"[Lane] is entitled to the subdivision (h) remedy as a matter of right if [Crouch's] actions found by the court meet Civil Code section 3294's 'oppression, fraud, or malice' definitions. . . . [¶] Here, the court's own findings establish that [Crouch] committed both malice and fraud, within the meaning of Civil Code section 3294, and the court's

41

finding that [Crouch's] DCCH breach 'does not rise to the level' of Family Code section 1101, subdivision (h) must be reversed." And, at the conclusion of her brief, "Lane hereby requests that [this] court modify the judgment to provide that [she] is entitled to 'an amount equal to 100 percent' of the value of the DCCH business as of the date of trial, $2,089,749, rather than her community property 50 percent share of that amount currently provided in the judgment." The request is denied.

According to the leading practice guide: "The § 1101(h) threshold evidentiary burden is difficult to meet." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2021) ¶ 8:625.5.) That burden requires a party to present clear and convincing evidence that the other party has committed malice or oppression or fraud, as those terms are defined in Civil Code section 3294, in the course of breaching a fiduciary duty.[14] But implicit in this formulation is a critical addition—the trier of fact has to agree that the case for what is

---

[14] "As used in this section, the following definitions shall apply:

"(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

"(2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

"(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c).)

42

equivalent to punitive damages was made. This is the rock on which Lane's argument founders.

In the days before federal due process imposed restrictions on the amount of punitive damages that can be assessed, the classic statement on punitive damages came from our Supreme Court in 1911:

"A plaintiff, upon establishing his case, is always entitled of right to compensatory damages. But even after establishing a case where punitive damages are permissible, he is never entitled to them. The granting or withholding of the award of punitive damages is wholly within the control of the jury, and may not legally be influenced by any direction of the court that in any case a plaintiff is entitled to them. Upon the clearest proof of malice in fact, it is still the exclusive province of the jury to say whether or not punitive damages shall be awarded. A plaintiff is entitled to such damages only after the jury, in the exercise of its untrammeled discretion, has made the award." (*Davis v. Hearst* (1911) 160 Cal. 143, 173.)

This language was repeated in 1948 and is still good. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801; 6 Witkin, Summary of Cal. Law (11th ed. 2021) Torts, § 1784, pp. 1208-1209; 23 Cal.Jur.3d (2021) Damages, § 159, p. 299, Crosskey et al, Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 13:196, p. 13-59.)

Punitive damages are fact-specific "since the degree of punishment depends on the peculiar circumstances of each case." (*Hannon Engineers, Inc. v. Reim* (1981) 126 Cal.App.3d 415, 431; accord, *Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 762; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1053.)

Lane points to authority such as *In re Marriage of Rossi, surpa*, 90 Cal.App.4th 34,[15] where the word "mandatory" is used in connection with a subdivision (h) penalty. And here the family court expressly found that "[Crouch's] breach of fiduciary duty in regard to DCCH does not rise to the level of Family Code 1101(h) which would have mandated an award to [Lane] of 100 percent of the value of DCCH." Lane would have this court set aside this determination, contending that a breach of spousal fiduciary duty ipso facto entitles the injured spouse to the extreme remedy of subdivision (h). That cannot be.

Lane's argument obliterates the distinction between subdivision (g) and subdivision (h). Both are predicated on a breach of fiduciary duty, as determined by the family court. Lane's proposed construction would make subdivision (g)—which allows for 50 percent as opposed to subdivision (h)'s 100 percent—superfluous, a result courts strive to avoid. (E.g., *Arntz v. Superior Court* (2010) 187 Cal.App.4th 1082, 1097; *Donnellan v. City of Novato* (2001) 86 Cal.App.4th 1097, 1103.) Lane would have any breach subject to the maximum penalty, leaving no scope for the more moderate corrective action enacted by the Legislature with subdivision (g). "[T]he canon against surplusage is strongest when an interpretation would render

---

[15] *Rossi* presented a paradigmatic instance of fraud: wife wins the lottery, files for divorce, and never tells husband about the winning ticket. Upon learning, the ex-husband persuaded the family court to set aside the judgment for the former wife's fraud and breach of fiduciary duty, and award him the entirety of the lottery proceeds under subdivision (h). The Court of Appeal stated: "This case presents precisely the circumstances . . . that . . . subdivision (h) is intended to address." (*In re Marriage of Rossi, supra*, 90 Cal.App.4th 34, 42.)

superfluous another part of the same statutory scheme." (*Marx v. General Revenue Corp.* (2013) 568 U.S. 371, 386.)

An even more fundamental objection is that Lane's construction of subdivision (h) is illogical. The family court, as the trier of fact, would have the power to find, as an issue of fact, that the actions or omissions of a party amount to a breach of fiduciary duty. But subdivision (h) has a requirement not found in subdivision (g)—that "the breach falls within the ambit of section 3294 of the Civil Code." Such a determination can only be made by the family court as the trier of fact. Lane's proposed construction would allow the court to make the initial finding of breach, but would deny it the power to decide whether "the breach falls within the ambit of section 3294 of the Civil Code." Such a schizoid view of the judicial function makes no sense, and we cannot accept that the Legislature codified it in section 1101.

It is a bedrock principle of civil law that the trier of fact can award compensatory damages, but decline to award exemplary or punitive damages. This principle was included in the Supreme Court excerpt quoted above. The essence of Lane's argument is to have this court overturn our Supreme Court's flat statements that (1) "even after establishing a case where punitive damages are permissible, [a party] is never entitled to them," as well as (2) "A plaintiff is entitled to such damages only after the jury, in the exercise of its untrammeled discretion, has made the award." (*Davis v. Hearst*, *supra*, 160 Cal. 143, 173.) Substitute "the family court" for "the jury," and we have the precise situation before. Lane would have this court decide that a trier of fact no longer has "the untrammeled discretion" or "the exclusive

45

province . . . to say whether or not punitive damages shall be awarded." (*Ibid.*)

That would be without precedent. The only California decision near to being on point is emphatically contrary to Lane. That case is *Sumpter v. Matteson* (2008) 158 Cal.App.4th 928, 930, 936, which, citing *Brewer*, rejected plaintiff's claim that the Court of Appeal should assess punitive damages as a matter of law despite jury's refusal to award them.

Our research has not discovered, in the entire nation, a single reported decision where a reviewing court overruled a trier of fact and awarded punitive damages. (See 22 Am.Jur.3d (2013) Damages, § 566, p. 528.) The point is accurately, if perhaps a bit too brutally, made by a Maryland court: "No matter how compelling a punitive damages award might seem to be under the facts of a given case, should the fact-finder *for any reason* opt against making such an award, *the plaintiff has no redress.*" (*Darcars Motors of Silver Spring, Inc. v. Borzym* (Md. Ct. Spec. App. 2001) 818 A.2d 1159, 1186, emphasis added.)

The point is not hard to understand in operation. For example, a family court judge could decide that the fiduciary breach was minor or unintentional or quickly corrected. The leading treatise concedes that "innocent" breaches can be easily committed. (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 8:618, p. 8-236.) Or the court could decide that the breach would be sufficiently redressed with an award of sanctions under sections 721 and 2107. (See *In re Marriage of Prentis-Margulis & Margulis*, *supra*, 198 Cal.App.4th 1252, 1270 citing *In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1477.)

46

Finally, the court could conclude that proof of the breach was not clear and convincing.

Lane's argument would also have this court turn its back on the established principle that a reviewing court will not reweigh the trial evidence to overturn the decision of the trier of fact on punitive damages.[16] (E.g., *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398; *Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 460 ["it is not our role to reweigh the evidence in support of punitive damages"]; *Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1462.)

Acceding to Lane's construction would also punch a hole in the line of decisions that while a breach of fiduciary duty can support an award of punitive damages (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 448; *Heller v. Pillsbury, Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1390; *Devers v. Greenwood* (1956) 139 Cal.App.2d 345, 351), breach by itself will not support an award of punitive damages unless malice, fraud or oppression is also found by the trier of fact. (*Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 715; *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1210, *Tomaselli v. Transamerica*

---

[16]  Lane argues that the decision to award the subdivision (h) sanction is a conclusion of law that we should review de novo. We disagree. It is clear that a civil jury confronting the issue of awarding punitive damages has a two-part inquiry. First, it decides the historical facts of what the defendant did or failed to do. Second, it then considers whether the defendant's acts or omissions meet the definitions of malice, fraud, or oppression. (See fns. 8, *ante*, & 15, *post*.) The first is unquestionably an issue of fact. Under the authorities cited in the text, the second is treated as equivalent to an issue of fact. If the two parts are not so treated, it would be nonsensical to speak of the "untrammeled discretion" of the jury or trier of fact as to whether the plaintiff will be awarded punitive damages.

47

*Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287, *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1154; *Delos v. Farmers Group, Inc.* (1979) 93 Cal.App.3d 642, 656–657.)

For each and all of these reasons, we cannot agree with Lane that this court should decide that the family court erred as a matter of law in concluding when it decided that Crouch's breaches of his spousal fiduciary duties did not, in the language of subdivision (h), "fall[] within the ambit of section 3294 of the Civil Code."

## DISPOSITION

The judgment is affirmed. The parties shall bear their respective costs of appeal.

_____

Richman, Acting P.J.


We concur:


_____

Stewart, J.


_____

Miller, J.


*Lane v. Crouch* (A154434)